365 So.2d 551 (1978)
Wilfred GREENE, Plaintiff and Appellee,
v.
Dale WRIGHT, James Gustafson, A. J. Boutte, Edwin Holeman and Commercial Union Insurance Co., Defendants and Appellants.
No. 12311.
Court of Appeal of Louisiana, First Circuit.
November 20, 1978.
*553 William D. Hunter, Morgan City, for plaintiff and appellee.
W. Arthur Abercrombie, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, for Dale Wright, James Gustafson, A. J. Boutte and Edwin Holeman.
John M. Duhe, Jr., Caffery, Duhe, Oubre & Gibbens, New Iberia, for Commercial Union Ins. Co. and Edward Holeman.
Thomas K. Kirkpatrick, Kirkpatrick, Keyser & Kirkpatrick, Baton Rouge, for James Gustafson.
Before ELLIS, BLANCHE and LOTTINGER, JJ.
*554 LOTTINGER, Judge.
This is an "executive officer" suit brought by the injured employee, Wilfred "Chip" Greene, against four supervisors, Thomas Edward Holeman,[1] the mine superintendent, James W. Gustafson, assistant mine superintendent-safety director, Dale Wright, maintenance foreman, A. J. Boutte, mine production foreman, and the company's liability insurer. The four supervisors brought a third party action against Cargill, Inc.'s liability insurer, Commercial Union Insurance Company (Commercial), to determine whether the policy extends coverage to them as "executive officers." On October 28, 1977, summary judgment was rendered in favor of the four supervisors determining that Commercial's policy with Cargill, Inc. included coverage for executive officers; however, the status of the four supervisors as executive officers was left in abeyance until the trial on the merits.[2]
The jury found all four supervisors to be executive officers and awarded the plaintiff $902,000.00 for injuries caused by their negligence. The trial judge, based on the defendants' third party demand, awarded those supervisors not defended by Commercial, indemnification for the attorneys' fees expended in defending the suit.
Commercial and one of the defendants, Thomas Edward Holeman, have suspensively appealed. The other three defendant supervisors, James W. Gustafson, Dale Wright and A. J. Boutte, have devolutively appealed. Plaintiff, Wilfred Greene, has neither appealed nor answered the appeal, nor has the workmen's compensation employer, Cargill, Inc., intervened.[3]
In deciding whether the jury verdict is in accordance with the record, this court makes the following findings of fact.
On December 24, 1975, Wilfred "Chip" Greene was working in the Cargill Salt Mine, Belle Isle, Louisiana. Mr. Greene was employed as a mechanic to do repairs on various specialized mining equipment.
The mine itself is located approximately 1,200 feet below the surface and consists of two levels. From the map introduced by the defendants, it appears that the mine is a maze of corridors and rooms from which salt has been extracted with smaller bored corridors to allow air to enter. Directions in the mine are given by numerical delineation of the corridors along with a compass direction.
On the morning of the accident, Mr. Gustafson was using a roof-bolter "Scott" truck to implant dynamite in the ceiling of One Main South by Five Main East near an upper level air entry in order to blow a "berm hole" which would allow more air to reach the second level of the mine. A "Scott" truck has an extension arm which is designed to lift a man in a bucket approximately 25 feet. While the arm was extended with Mr. Gustafson in the bucket, the truck developed a hydraulic oil leak which resulted in Mr. Gustafson being unable to lower the arm.
Gustafson climbed down the arm and notified Wright that the "Scott" truck was inoperable and in need of repair. Between 9:30 and 10:00 A.M. Wright sent Raymond Abatte and Merlin Boutte to repair the broken hose from which the hydraulic oil had escaped, but they were unable to replace the oil.
Around 12:40 P.M. Mr. Greene was requested to proceed to the lower level of the mine in order to fill the "Scott" truck with the hydraulic oil. There is contradictory testimony as to just what location was given to Mr. Greene in order to find the "Scott" truck. Mr. Greene proceeded in a service truck to secure a drum of oil to place in the "Scott" truck in order to lower its arm and remove the truck from its location.
*555 At approximately that same point in time, Mr. Gustafson was communicating with Mr. Boutte on the chances of blasting some of the charged holes before the end of the shift. Since this was Christmas Eve, the shift was to be ending two hours earlier, at 1:30 P.M. instead of 3:30 P.M. It was common procedure to blast the charged holes in the mine before the end of the day's shift. During that conversation, Mr. Boutte informed Mr. Gustafson that Mr. Greene was on the lower level of the mine.
In order to speed up the repairs, Gustafson next communicated with Dale Wright who in turn instructed plaintiff to only secure 15 to 20 gallons of oil in order to accelerate his removal of the truck. Greene re-requested directions to the truck in order to determine its location.
At this point in time Mr. Boutte decided to send two men to locate Greene and to see how the repairs were progressing. It was subsequently reported to Mr. Boutte by these two men that they had seen service truck tracks around where the "Scott" truck was to be repaired, and it appeared that the wrong tank had been filled with oil. The truck had not been removed, and they were unable to locate Greene. They assumed that Greene had been there and left.
Meanwhile, Greene had again called to request directions from Dale Wright. The call was placed on the hallo-phone system which existed between the different levels of the mine. A hallo-phone system is the old type crank system which usually contains a lot of static.
Prior to the incident resulting in injury to his right hand, Mr. Greene was injured by hot slag in his ear which resulted in a hearing loss. The hearing loss was caused by a work related accident and was known by his supervisor, Dale Wright.
Mr. Wright testifies that on the third request from Mr. Greene he informed him that the "Scott" truck was located at "First Main South, the air entry by Fifth Main East." The purpose of the "berm hole" was to allow air from the air entry located on the upper level to feed air to the lower level. There was no air entry on the lower level at First Main South, Fifth Main East.
According to plaintiff's witness, Mr. Raymond Abatte, an employee in the maintenance department, he overheard the conversation between Greene and Wright as to the location of the truck. He claims that Wright told Greene to "go back and pass where you worked on that machine a couple of days before." Apparently there was some possible confusion over which machine was referred to, if in fact that statement was made. Approximately two weeks before the accident Greene had worked on machinery in the blast area. After the third time Greene was given directions to the truck, Mr. Wright decided to join Greene and commenced running to the manlift, a device used to raise and lower men into the mine.
Within several minutes, based on the erroneous assumption that Mr. Greene had improperly repaired the truck and was now presumably in a safe location, Mr. Gustafson ordered the charged holes fired.
The blast occurred between 1:10 and 1:20 P.M. in Fourth Main East and Fifth Main East, room five. Mr. Greene was approximately 160 yards from the blast area. He attempted to use his right hand to shield his face from the blast.
Mr. Greene was located in the manlift following the accident with a severely mangled right hand. He was immediately rushed to Franklin Foundation Hospital and later transferred to Our Lady of Lourdes Hospital in Lafayette.
The appellants assign the following specifications of error alleged to have been committed by the jury:
I. Errors assigned by Commercial Union Insurance and Thomas Edward Holeman.
"(1) Finding defendants Boutte, Wright and Gustafson to be executive officers of Cargill, Inc.
(2) Finding defendants Boutte, Wright, Gustafson and Holeman to have been guilty of negligence which was a proximate cause of plaintiff's injury.

*556 (3) Failing to find plaintiff guilty of contributory negligence which was a proximate cause of his own injury.
(4) Allowing the witness M. R. Jacobson to express his opinion of the meaning and intent of MESA regulations.
(5) Excluding from evidence the amount of workmen's compensation benefits paid to plaintiff by Commercial Union Insurance Company.
(6) Awarding plaintiff any amount of damages whatever and, in the alternative, an excessive amount of damages."
"II. Errors assigned by James Gustafson.
"(1) Finding defendants Boutte, Wright, Gustafson and Holeman to have been guilty of negligence which was a proximate cause of plaintiff's injury.
(2) Failing to find plaintiff guilty of contributory negligence which was a proxmate [sic] cause of his own injury.
(3) Allowing the witness M. R. Jacobson to express his opinion of the meaning and intent of MESA regulations.
(4) Excluding from evidence the amount of workmen's compensation benefits paid to plaintiff by Commercial Union Insurance Company.
(5) Awarding plaintiff any amount of damages whatever and, in the alternative, an excessive amount of damages."
III. Errors assigned by Dale Wright and A. J. Boutte.
"1) In finding Dale Wright and A. J. Boutte to have been guilty of negligence which was a proximate cause of plaintiff's injuries;
2) Failing to find plaintiff guilty of contributory negligence which was a proximate cause of his own injuries;
3) Failing to find that plaintiff assumed the risk of his injuries; and
4) Awarding plaintiff any amount of damages whatever and, in the alternative, an excessive amount of damages."
In order to comprehensively examine the errors presented by all the appellants, this court considers there to be four main issues which need be discussed:
(1) the status of the three individually named defendants denied coverage by Commercial as not being executive officers;
(2) the negligence on the part of the four individually named defendants;
(3) the possible contributory negligence and/or the assumption of risk on the part of the plaintiff; and
(4) the quantum awarded by the jury.
As to the errors presented concerning the admission on rebuttal of that part of the deposition of M. R. Jacobson[4] which contained opinion testimony, appellants contend that the admission of a non-expert's opinion on the application of Mining Enforcement and Safety Administration (MESA) regulations prejudiced their case and thus caused reversible error.
Opinion testimony of lay witnesses as a general rule is excluded. Taylor v. Roach, 302 So.2d 327 (La.App. 1st Cir. 1974). In Taylor, supra, this court found the witness did not possess "sufficient facts to properly draw a conclusion as to defendant's intention."
The facts presented in our case reveal that although the opinion testimony was given by a non-qualified expert, M. R. Jacobson was in fact the person in charge of enforcing those regulations referred to in the rebuttal testimony. Jacobson, the mine inspector who had previously cited Cargill mines for various violations, perhaps erroneously failed to cite Cargill for not having barricades on the lower level in compliance with MESA regulations 57.6-103 and 57.6-175;[5] however, the inspector's failure to *557 issue a citation for a violation of the regulations in no way relieves Cargill, Inc. and its employees from the duty to conform to those regulations.
Therefore, we find no harm or prejudice sufficient to mandate a reversal resulting from the admission of the opinion testimony offered as rebuttal to the defense witnesses.
Further, it is contended by the insurer that evidence as to the workmen's compensation payments in mitigation of loss income to the date of trial was erroneously excluded by the trial judge. We can find no ruling in the record by the trial judge excluding such evidence, nor any proffer of such as allowed by La.C.C.P. art. 1636. Since the insurer failed to make an offer of proof, it cannot now complain on appeal. Carroll v. Guillot, 337 So.2d 310 (La.App. 3rd Cir. 1976) and Nettles v. Evans, 303 So.2d 306 (La.App. 1st Cir. 1974).

ISSUE NO. 1
It is argued that there is nothing in the record to show that three of the defendants, Gustafson, Boutte and Wright, held employment status constituting managerial positions, citing Hadrick v. Diaz, 302 So.2d 345 (La.App. 1st Cir. 1974).
This court in Hadrick, supra, stated that:
"Further considering Thibodeaux, above, we do not view that decision as holding that managerial responsibility for the affairs of a corporation generally is an indispensable prerequisite to the status of corporate executive. Said element is but one of the numerous factors to be considered in such a determination."[6]
We went on to list other factors determining executive status;[7] however, there was no implication that this was an exclusive list, and that other factors were not determinative.
The Third Circuit grasped the proper application of Hadrick, supra, when in Coco v. Winston Industries, Inc., 330 So.2d 649, 660 (La.App. 3rd Cir. 1975) reversed on other grounds 341 So.2d 332 (La.1976), while speaking of the term "executive officer" held:
"No precise definition or hard and fast rule has ever been laid down. It appears that the question must be resolved by considering many factors on a case-bycase basis. It is noted that the problem is essentially one of contract interpretation. Any indefiniteness in the expression must be construed against the insurer. In Hadrick v. Diaz, 302 So.2d 345 (La.App. 1st Cir. 1974), several factors to be considered in this determination were listed. We do not think the list is exclusive. There may be other considerations. It is a question of the party's intention. This executiveofficer coverage is apparently designed to hold key employees. We think other important considerations would be the value *558 of the employee's services to the employer, the ease with which the employee could be replaced, the importance of the employee's functions to the employer and the extent to which the employee's ordinary functions tend to expose him to liability."
Appellant's argument seems to center around the immense size of Cargill, Inc. and the relative insignificance of these three supervisors vis-a-vis the corporate structure. The issue which the jury decided affirmatively was whether these three supervisors were in an executive position at the time of the accident.
JAMES W. GUSTAFSON, as the assistant mine superintendent and a salaried employee, was the second in command, with no other superior at the mine except Ed Holeman. In the absence of Mr. Holeman, the mine superintendent, he was in charge of the mine and could appropriate necessary funds to the same extent as the superintendent. Though Holeman was the mine superintendent, Gustafson was basically in charge of the day to day operations of the mine. He was in charge of safety for the entire mine, and could discipline for failure to follow safety rules. Additionally, he had the authority to discharge personnel and review applications for employment. He could reroute barges used in the shipment of the salt. Finally, he helped formulate the budget for the mine. His vast range of responsibility made him an important employee, and the decisions which he was called upon to make continuously exposed him to the possibility of liability. There is no doubt that Mr. Gustafson was in all senses of the word "an executive officer."
A. J. BOUTTE, a salaried employee, was the production foreman with responsibility for all production in the mine. His job was to get the right type salt mined at the right time. Only Holeman and Gustafson were above him in the chain of command at the mine. He was responsible for fourteen pieces of very valuable equipment, had eleven men under his supervision, and could fire any of them. In the morning and afternoon, he met with Holeman and others to help formulate mine policy. Though he could initiate hiring, he could not complete it. When tools were needed, he could spend company money. We find him to be a key employee, exposed to liability, and thus an executive officer.
DALE WRIGHT was the shop foreman and a salaried employee at the time of this accident. He had twelve or thirteen people under him, any of whom he could fire. Additionally, he could initiate hiring a new employee. His department was responsible for the maintenance and repair of between 35 and 40 pieces of equipment, and his duties consisted of planning and scheduling repairs and maintenance, as well as the supervision thereof. He was responsible only to Preston Romero and Holeman. Mr. Wright attended morning meetings to establish mine policy, and he could suggest changes in company policies. In the furtherance of his responsibilities, he could spend company funds for parts and repairs. Lastly, as did all supervisory personnel, he could enforce safety rules. Therefore, we find Dale Wright to be a key employee, exposed to liability, and thus an executive officer.
We, therefore, find no error on the part of the jury in holding these three employees to be executive officers.

ISSUE NO. 2
In order to determine negligence, the jury must find that based on the facts presented (1) Cargill owed a duty to the plaintiff, the breach of which caused damages for which he seeks recovery, (2) the duty was delegated by Cargill to the four executive officers, and (3) the defendants breached the duty through their own personal fault. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
*559 La.R.S. 23:13[8] along with Cargill's own company policy[9] requires that the employer render to the plaintiff a safe place to work. Along with the statute and Cargill's own policy, the MESA regulations, cited supra, obligate Cargill to display some sort of alert system designed to prevent accidents in the mine which cause injury to persons who are in the area of blasting either intentionally or accidently.
Although the violation of a MESA regulation does not give rise to civil liability,[10] the Louisiana Supreme Court has deemed the use of a national safety code appropriate in Burley v. Louisiana Power & Light Co., 319 So.2d 334, 338 (La.1975), holding:
"Thus, where evidence of the contents of a publication is admissible under our law (La.R.S. 13:3713), and relevant and material information contained therein should be made available to the trier of facts, and the publication is one which reasonable minds would agree is trustworthy, there appears to be no sound reason why such evidence should not be given such probative weight as it warrants in the court's judgment."
It is apparent that the regulations were designed to prevent injury to persons from blasting, and thus "while statutory violations are not in and of themselves definitive of civil liability, they may be guidelines for the court in determining standards of negligence by which civil liability is determined." Smolinski v. Taulli, 276 So.2d 286, 289 (La.1973).
The general tort principle obviously applicable to this case is that "those who use or handle dangerous agencies, substances or instrumentalities such as explosives, electricity, firearms, combustibles and fireworks, which might endanger persons or property, are held to a high degree or extraordinary degree of care." Gregory v. Guarisco, 320 So.2d 354, 356 (La.App. 2nd Cir. 1975).
Cargill has delegated its responsibility in maintaining safe working conditions to its mine superintendent, Ed Holeman, who in turn has delegated that responsibility to his safety director, Gustafson, and the foremen in charge, Boutte and Wright. This court finds that Cargill, Inc. and its executive officers had a personal duty not to breach the high degree of care established by general tort principles, La. R.S. 22:13, the Cargill policy, and the MESA regulations with regard to the maintenance of a safe place to work and the proper standard for handling and using dynamite.
After a thorough and exhaustive review of the record, we are convinced, as was apparently the trial jury, that Gustafson, Wright and Boutte each had personal knowledge that plaintiff had been sent down to the lower level of the mine, and that he was confused as to where he was to *560 go. They did not know where he was, and still, without apprehension or refusal pulled the trigger on 700 pounds of dynamite. The high or extraordinary degree of care required of those handling explosives imposed on these supervisors the duty of knowing the whereabouts of plaintiff before blasting. Their actions fall far below the standard required, thus constituting a breach of duty.
As to Ed Holeman, it is strenuously argued that he was not personally involved in the decision made to blast, and thus should not be held liable.
"If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm." (Footnote omitted.) Canter v. Koehring Company, supra, at 721.
In Canter, supra, the plant construction engineer was absolved of personal negligence contributing to the plaintiff's injury, to wit:
"Spalding [Pittsburgh's plant construction engineer] is shown to have committed no affirmative act contributing to the accident. There is no showing, for instance, that Spalding delegated his responsibility to an incompetent subordinate, so as to share personal fault for the subordinate's act, nor that he should by the exercise of reasonable care have known of the breach of duty by the subordinate Pittsburgh engineers and had nevertheless failed to act within a reasonable time under the circumstances." 283 So.2d 727
Under the facts presented in this case the defendant, Ed Holeman, had personal knowledge that warning signals were not being used on the lower levels of the mine. Although it is argued that the inspector failed to cite Cargill for not having warning devices on the lower level, it is clear that the need for warning devices, in light of the high degree of care required in the handling of explosives was designed to protect this plaintiff, and thus, the failure of Ed Holeman to order adequate warning devices constitutes a breach of duty resulting in personal liability for his omission.
We find no error on the part of the jury in holding all four defendants liable based on the duty imposed and the breach which resulted in injury to the plaintiff.

ISSUE NO. 3
The factors to consider in determining whether the plaintiff was contributorily negligent and/or assumed the risk are:
"* * * (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger." Miller v. Employers Mutual Liability Ins. Co., 349 So.2d 1353, 1362 (La.App. 2nd Cir. 1977), writ denied 352 So.2d 235 (La.1977).
Assuming that plaintiff knew of the possibility of blasting at the end of the shift, defendants had the burden of proving that plaintiff knew of the danger and voluntarily assumed the risk, or that he acted negligently in executing the task he was requested to perform.
Appellants rely on the fact that plaintiff used an unorthodox route which resulted in his presence in the blast area. Though the route might have been unusual, this court fails to see how that in and of itself constitutes contributory negligence or assumption of the risk.
The determination of contributory negligence and assumption of the risk is to be made in the light of the facts presented in each case. We have found no facts in this record which would lead this court to believe that plaintiff was either contributorily negligent or assumed the risk.

*561 ISSUE NO. 4
The most difficult issue in this case is the quantum awarded the plaintiff, $902,000.00.
Appellants argue that the award is grossly excessive based on the injury, and the expected loss of future income which they contend was incorrectly determined by plaintiff's economic expert.
In Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976), the Louisiana Supreme Court said:
"* * * that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. * * * Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. * * * It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
Again in Schexnayder v. Carpenter, 346 So.2d 196, 198 (La.1977), the Supreme Court said, "since the jury does have, under the law, much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury."
This court in Grasso v. Hebert, 342 So.2d 1178, 1180 (La.App. 1st Cir. 1977) said, "appellate review of an award for general damages, especially for personal injuries, is limited to determining whether the trial court or jury abused its discretion, and the adequacy or inadequacy of such an award is determined on the basis of the facts peculiar to each case. Such an award is not to be disturbed on appeal save in a case of clear and manifest error."
This court in the shadow of Coco v. Winston Industries, Inc., supra, and its progeny is of the opinion that the facts presented more than justify the award made by the trial jury.
Dr. Cromwell, a plastic surgeon, performed a total of 12 surgical procedures in an attempt to save as much of Mr. Greene's right hand as possible. The plaintiff was left with no mobility in the right wrist and thumb, along with the amputation of his little finger due to severe pain. A nerve was severed in order to relieve some of the pain; however, this in turn caused a droop in his right eyelid and blurred vision.
Mr. Greene suffers pain in his hand, and under the direction of Dr. Laborde, he is using a TENS, transcutaneous electrical nerve stimulator, designed to block the pain at certain nerve points in his right shoulder and back. The TENS is an electrical battery operated device which sends an electrical shock to the nerve points in order to interrupt and short circuit the chronic, persistent pain. The TENS has in this case relieved some of the more excruciating pain, but plaintiff still suffers a lower more tolerable degree of pain. This device is worn by Mr. Greene daily in order to relieve his pain.
Plaintiff has also undergone vocational and psychological testing by Dr. David Clark who testified as to Greene's limited intelligence and his attempts to cope with the results of the accident. Mr. Greene is presently under the psychiatric care of Dr. William Cloyd.
In summation, this court is in concurrence with the listing in plaintiff-appellee's brief that the physical and psychological injuries suffered by Mr. Greene are:
Convergence and accommodation insufficiency resulting from eye trouble, especially when doing close work for a prolonged period of time;
He has incurred 13 surgical procedures on his arm, hand, neck and spine;
He has incurred a cervical sympathectomya surgical procedure where the sympathetic nerves leaving the spine to the right arm are severed;

*562 Drooping eyelid caused by the cervical sympathectomy;
Loss of some temperature differentiation to right side of his face;
Loss of right peripheral vision known as "hysterical visual field loss" caused by emotional trauma;
Severe psychoneurotic depressive reaction;
Phantom pain at the amputation site of the little finger;
Permanent scars from bone and skin grafts:
a. At the hip;
b. Left arm;
c. Left thigh;
Numbness where skin was grafted to the hand;
Substantial weight loss;
Hair turning gray at age 31;
Chronic inability to sleep;
Permanent disfigurement of right hand;
Nodular type mass in right shoulder referred to as a "pain trigger point";
Chronic pain in his back, right shoulder, and arm;
Suicidal tendencies;
Irritation and itching of TENS electrode attachment sites on his back;
Claustrophobia, fear of going into small places;
Right hand turning blue and painful in cold weather.
A thorough examination of the record convinces us that the evidence presented by the plaintiff is sufficient to justify a substantial award for pain and suffering. In addition to his own testimony, the plaintiff's qualified expert physicians testified that in their opinion Mr. Greene's pain is genuine, and that he is neither a faker nor a malingerer. Along with the physical loss of the plaintiff's effective use of his right hand, the mental anguish suffered by the plaintiff and the loss of his self-esteem, plaintiff faces the real possibility of the amputation of his entire right hand. The doctors agree, however, that the amputation of the right hand would probably not eliminate the pain which in all likelihood would persist psychologically, it having left a mental imprint on him.
Since this was an in globo award, there is no indication as to what part of the award is attributable to the pain and suffering of the plaintiff. Further, evidence of the plaintiff's loss of past and future income totaling $652,958.35[11] was presented to the jury by plaintiff's expert in the field of economics, Dr. Seymour Goodman.
Appellants argue that Dr. Goodman in making his computations of plaintiff's loss of future income used inaccurate factors, i. e. a productivity increase of 3 per cent, gross income rather than take home pay, and a discount rate of 6 1/8 per cent rather than 8 per cent. No expert witness was presented by defendants to dispute the factors used by Dr. Goodman, even though it is argued by appellants that by using an 8 per cent discount rate plaintiff's award for future income would be between $350,000.00 and $400,000.00. We find no error in the use of these factors, nor do we find them inaccurate. See Johnson v. International Ins. Co., 347 So.2d 1279 (La.App. 1st Cir. 1977), writ denied 350 So.2d 1225 (La. 1977) for a full discussion by this court of the use of such factors.
Defendants would have this court believe that the jury awarded approximately $31,000.00 for the loss of past earnings, $250,000.00 for pain and suffering, and $621,000.00 for the loss of future earnings. Such a supposition cannot be unequivocally drawn from an in globo award. The pain and suffering which plaintiff must endure is not only excruciating, but there is the distinct probability that he may have to suffer pain for the rest of his life. The jury could have just as easily awarded more for pain and suffering and less for loss of future earnings.
*563 Additionally, this court is of the opinion that the trial court jury could have within its discretion, based on the facts in this case, awarded between $450,000.00 and $500,000.00 for pain and suffering and a like amount for loss of future earnings, thus resulting in an award of over $1,000,000.00. Necessarily then, we find no error in the award made by the jury.
Therefore, for the above and foregoing reasons the judgment of the trial court is affirmed. All costs of this proceeding are to be paid by Commercial Union Insurance Company.
AFFIRMED.
NOTES
[1] Thomas Edward Holeman was herein cited and served as Edwin Holeman, and answered the petition as Edwin Holeman.
[2] Commercial admits executive status on the part of Thomas Edward (Edwin) Holeman.
[3] There is nothing in the record to reflect whether Cargill, Inc., as the employer of the plaintiff, was notified of the tort action instigated by the plaintiff. La.R.S. 23:1102.
[4] Mr. Jacobson is a mine inspector with the Mining Enforcement and Safety Administration, United States Department of the Interior.
[5] "57.6-103 Mandatory. Areas in which charged holes are awaiting firing shall be guarded, or barricaded and posted, or flagged against unauthorized entry."

"57.6-175 Mandatory. Ample warning shall be given before blasts are fired. All persons shall be cleared and removed from areas endangered by the blast. Clear access to exists shall be provided for personnel firing the rounds."
[6] This court's decision in Thibodeaux v. Parks Equipment Company, 185 So.2d 232 (La.App. 1st Cir. 1965) writ refused 249 La. 193, 194, 186 So.2d 157 (La.1966) as to the strict standard applicable to determine executive officer status no longer reflects the position of this court nor is it in line with our later decisions in Cain v. Witco Chemical Corporation, 341 So.2d 1220 (La.App. 1st Cir. 1976) writ denied 343 So.2d 1078, 1079 (La.1977) and Hadrick v. Diaz, supra.
[7] In dealing with "executive officer" status this court in Hadrick, supra, held the following factors relevant:

(1) Whether the employee's position was created by corporate charter;
(2) Whether the employee was formally elected or designated to his office or position by the Board of Directors, the officers or stockholders;
(3) Did the employee have authority, discretion and managerial responsibility covering the divergent affairs of the corporation;
(4) Did the employee have duties or authority outside his particular department;
(5) Was the employee involved in shaping company policy;
(6) Did the employee possess authority to alter contract terms or conditions or to change specified company procedure;
(7) Whether the employee had several department heads under his supervision;
(8) Whether the employee had a large number of employees under his direction and control, and
(9) Did the employee have authority to hire and fire other employees?
[8] La.R.S. 23:13 provides:

"Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations."
[9] Belle Isle Salt Mine Safety Code Provides:

"Responsibility: The Mine Superintendent is responsible for the safe operation of the mine and surface facilities. He may delegate authority and responsibility to `key' men, but all points not covered in this safety code must be approved by him. . . .
"GENERAL SAFETY RULES
"2. No employee shall ever be in the mine by himself."
[10] Metal and Nonmetallic Mine Safety Act, 30 U.S.C. § 738(c) provides:

"Nothing in this chapter shall be construed or held to supersede or in any manner affect the workmen's compensation laws of any State or territory, or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under State or territorial laws in respect of injuries, occupational or other diseases, or death of employees arising out of, or in the course of, employment. Pub.L. 89-577, § 19, Sept. 16, 1966, 80 Stat. 784" repealed, Pub.L. 95-164, Title III, § 306(a) Nov. 9, 1977, 91 Stat. 1322.
[11] The total loss of past income is $31,719.96 and the estimated loss of future income is $621,238.39.