459 So.2d 1360 (1984)
Velma Myers LANCON, Plaintiff-Appellant,
v.
Peter VALLOT, Jr., Defendant-Appellee.
No. 83-1095.
Court of Appeal of Louisiana, Third Circuit.
December 12, 1984.
*1362 Mestayer & Simon, S. Gerald Simon, New Iberia, for plaintiff-appellant.
Domengeaux & Wright, Bob F. Wright, Lafayette, for defendant-appellee.
Before DOUCET, LABORDE, and YELVERTON, Judges.
LABORDE, Judge.
Defendant is the lessee of certain land owned by plaintiff. Plaintiff sued defendant to terminate the lease and for damages, contending that defendant breached provisions of the lease by not providing sufficient insurance coverage, by not providing satisfactory evidence of insurance coverage, by subleasing the property to other businesses, and by occupying unleased portions of plaintiff's land. Defendant reconvened and claimed damages based on the alleged deprivation by plaintiff of defendant's full use of the leased area. After a trial on the merits, the trial judge dismissed the claims of both parties. Plaintiff appeals. We affirm.
Plaintiff Velma Myers Lancon is the owner of a tract of land in Iberia Parish. She maintains part of this property as a farm, upon which she raises horses and occasionally entertains friends and relatives.
In 1976, she leased approximately twenty-five acres of her land to defendant Peter Vallot, Jr. This lease is not a simple residential or agricultural lease, as the discussion below makes quite clear. Defendant leased the property for commercial purposes. Defendant owns or controls several business enterprises that may conveniently be classified as oil-field service companies.
The leased property is adjacent to plaintiff's unleased land. The nearest public road is approximately two thousand feet from the leased property, and the lease provides that lessee has the right to use and the obligation to maintain a private road running through plaintiff's unleased land from the public road to the edge of the leased property.
The lease agreement requires that defendant maintain liability insurance on the leasehold for the protection of plaintiff in the amount of $1,000,000 for personal injury claims and $1,000,000 for property damage claims. The lease agreement also limits the right of lessee to sublet the property. The particulars of the sublease and liability insurance clauses and further facts necessary for the disposition of this case will be discussed as they relate to the issues raised by plaintiff on appeal.
Plaintiff contends that the trial judge committed seven errors. Because of our disposition of this case, we need not consider two of the issues raised by plaintiff.[1] The five issues that we will consider are:
1. Whether the trial court erred by finding that defendant did not breach the lease by failing to comply with the provisions of the lease concerning lessee's obligation to provide insurance coverage for the protection of lessor.
2. Whether the trial court erred by finding that defendant did not breach the *1363 lease by failing to comply with its provisions concerning lessee's obligation to provide lessor with copies of insurance policies and certificates.
3. Whether the trial court erred by accepting opinion testimony from witnesses not qualified nor accepted as experts.
4. Whether the trial court erred by finding that defendant did not breach the lease by violating the provisions of the lease concerning assignment and sublease.
5. Whether the trial court erred by finding that defendant did not breach the lease by laying claim to and attempting to possess portions of lessor's land not subject to the lease.

DID DEFENDANT PROCURE ADEQUATE INSURANCE COVERAGE FOR THE BENEFIT OF PLAINTIFF?
The lease agreement provides: "LESSEE agrees to maintain liability insurance in the amount of One Million and No/100 ($1,000,000.00) Dollars bodily injury liability and One Million and No/100 ($1,000,000.00) Dollars property damage to protect LESSOR...."
Plaintiff-lessor does not contend that defendant-lessee did not procure any insurance, nor that the procured insurance fails to protect her; rather, plaintiff contends that the insurance scheme utilized by defendant fails to provide the total amount of coverage dictated by the lease agreement.
Defendant's insurance agent arranged defendant's insurance of plaintiff through the Metairie, Louisiana office of Gray & Company. Gray & Company is a firm that manages the underwriting of various types of insurance, including coverage of the complex risks faced by participants in the petroleum exploration and production industry.
Defendant's insurance scheme for the benefit of plaintiff is one common in the oil-field industry. Defendant, through Gray & Company, procured the first $85,000 of coverage from North River Insurance Company of Morris Town, New Jersey. From $85,000 up to $5,000,000 (not merely $1,000,000), International Surplus Lines Insurance Company of Chicago, Illinois, is the underwriter of the policies covering plaintiff.
Plaintiff's objection is to the deductible entailed by this insurance scheme. The first $35,000 of a claim must be paid by defendant. There is a variable cap on deductibles within specified years, so that the underwriters provide total coverage after a certain dollar amount of claims have been paid out.
Under his contract with Gray & Company, defendant maintains a checking account with Guaranty Bank & Trust solely for self-insurance to cover deductible claims or the deductible portion of a claim. The bank can only issue a check from the account on the joint signature of Am-Vak and Gray & Company. The insurance contract requires that the account be sufficient to pay all deductibles, with a minimum initial balance of $35,000.
As a safety device, the agreement between Gray & Company and defendant requires that Am-Vak maintain a letter of credit to cover deductible claims in the event that the bank account self-insurance funds are unavailable (e.g., if defendant's creditors should ever seize the account). Furthermore, Gray & Company is obligated, under the terms of the agreement, to provide a defense for all claims, including claims that are wholly deductible.
We agree with the trial judge that the insurance scheme discussed above complies with the dictate of the lease agreement. Realistically, defendant cannot be expected to procure total underwriting of $1,000,000 worth of liability insurance with no deductible provisions, and we can hardly imagine that that could have been the intention of either party at the time of the lease agreement. See La.Civ.Code arts. 1945, 1950. Defendant actually has provided plaintiff with $4,000,000 more coverage than that which he is contractually obligated to provide.
Plaintiff, in brief and at trial, contends that the coverage, in effect, leaves too *1364 many loopholes, too much possibility that some party in the chain of insurance will not live up to its obligations and therefore expose plaintiff to personal liability. It is, of course, entirely possible that unforeseen circumstances could result in a lapse of coverage, or at least create legal problems for plaintiff.[2] However, there is no indication that defendant's insurance plan has not functioned properly to date. There is a certain amount of risk entailed by any lease or commercial endeavor. The parties in this instance, both represented by able counsel, bargained for a fair allocation of that risk. Defendant has held up his end of the bargain.
The trial court did not err by finding that the insurance defendant procured for plaintiff's benefit complies with the lease requirement.
DID DEFENDANT PROVIDE PLAINTIFF WITH INSURANCE POLICIES AND CERTIFICATES THAT COMPLY WITH LEASE REQUIREMENTS?
We discussed above the insurance coverage requirements of the lease agreement. In reference to that insurance, the lease further provides: "LESSEE agrees to furnish LESSOR with a copy of said insurance policy or policies and a certificate certifying that said policy or policies are in full force and effect at all times during the term of this lease and the renewals thereof."
Plaintiff-lessor contends that defendant-lessee did not comply with the lease requirement in regard to the insurance policies because the policies have a deductible provision. We have already effectively disposed of this claim. The policies complied with lease insurance coverage requirements, therefore, when defendant provided plaintiff with copies of the policies, he complied with the lease requirement at issue here, as far as the policies themselves are concerned.
Plaintiff presents a slightly stronger argument that the certificate of insurance does not meet the lease requirement. Again, defendant provided plaintiff with a certificate, but plaintiff questions whether that certificate, in compliance with the lease, "certif[ies] that [the insurance is] in full force and effect at all times during the term of this lease and the renewals thereof."
The certificate of insurance, issued by Gray & Company, relates the named insureds, the amount of and nature of coverage, and the identity of the underwriters. The certificate then concludes:
"Should the insurance herein described be cancelled, assigned or changed in such a manner as to affect this certificate, Gray & Company, Inc. will endeavor to give 10 (ten) days written notice to the certificate holder; but failure to do so shall impose no obligation or liability upon the Underwriters or Gray & Company, Inc."
Plaintiff argues that, under the terms of the lease, the issuance of this certificate is the equivalent of issuing no certificate at all, because this certificate does not guarantee that plaintiff will, at all times, have liability insurance to protect her as landowner of the leased premises. Again, we note that plaintiff is ignoring the reality of the situation. Defendant has furnished her with a usual form of a certificate of insurance, and we doubt that defendant, or any person in defendant's position, could ever procure an unqualified guarantee that coverage *1365 will never, under any circumstances, lapse or be cancelled. We find, as did the trial judge, that defendant has met the lease requirement by providing the certificate. There is no indication that the insurance coverage stated on the certificate has ever been cancelled or lapsed.
We interpret the agreement in light of the reasonable intentions of the parties at the time of execution: that defendant remove as much risk as possible from plaintiff by insurance and that defendant provide plaintiff with a certificate evidencing that effort. We will not interpret the agreement in a manner that would place an impossible burden on defendant. See La. Civ.Code arts. 1945, 1955. See generally Comment, The Louisiana Law of Lease, 39 Tul.L.Rev. 798 (1965).
Defendant provided insurance policies and certificates in compliance with the lease agreement.
DID THE TRIAL COURT ERR BY ACCEPTING OPINION TESTIMONY FROM WITNESSES NOT QUALIFIED AS EXPERTS?
Plaintiff contends that the trial judge erred by his questioning of two of defendant's witnesses. The witnesses were George Keenan, who is assistant to the underwriting manager with Gray & Company, and Dan Blum, who is the independent insurance agent for Mr. Vallot and Am-Vak.
The witnesses were not offered as experts, and plaintiff does not contend that defendant's counsel attempted to elicit expert opinion testimony by his questioning; rather, plaintiff contends that the trial judge improperly elicited opinion testimony from the two witnesses.
The court asked Mr. Keenan if he thought the insurance defendant obtained through Gray & Company would completely cover claims of up to $5,000,000 against plaintiff as the landowner of the leased premises. Mr. Keenan responded affirmatively. The court asked Mr. Blum if he thought defendant's coverage of plaintiff complied with the lease requirements. Mr. Blum answered yes.
Initially, we note that plaintiff did not object to the questions or answers at the time of the trial. At a more basic level, however, the witnesses' testimony did not require a tender and acceptance as experts. Any witness may testify as to opinions or inferences which are based on the rational perception of facts by the witness and are helpful to a clear understanding by the fact-finder (here, the trial judge) of the testimony of the witness or to the determination of a factual issue. See Montelbano v. Montelbano, 415 So.2d 303, 305 (La. App.2d Cir.), writ denied, 420 So.2d 163 (La.1982); Greene v. Wright, 365 So.2d 551, 556-57 (La.App. 1st Cir.1978); cf. Fed. R.Evid. 701. Here, the testimony of the two witnesses was at least relevant to the issue of whether defendant made a good faith effort to comply with the lease insurance provisions, which would have aided the trial judge in assessing damages had he found a breach of the lease. Moreover, the testimony was admissible because it constituted the "rational perception of facts" held by the two witnesses.
The weight that the fact-finder gives to such testimony is, of course, based on a determination of credibility. The trial judge determined, from prior testimony of these two witnesses, that they could offer credible and knowledgeable answers to his questions. Therefore, he properly assigned the weight (if any) that the contested testimony carried in his decision. The trial judge did not err by eliciting this testimony from Messrs. Keenan and Blum.
DID DEFENDANT BREACH THE LEASE AGREEMENT BY SUBLEASING TO OTHER BUSINESSES?
The lease agreement between plaintiff-lessor and defendant-lessee provides:
"LESSEE shall not assign or sub-let all or any part of the leased premises without prior written consent of the LESSOR, unless such sublease is an integral part of LESSEE'S business activity or to persons in related industries, and in any event LESSEE shall not be released from the obligations of this lease."
*1366 In October of 1976, defendant-lessee assigned his entire leasehold interest to Am-Vak Corporation. Am-Vak immediately moved its operation to the leasehold. Defendant owns ninety percent of Am-Vak's stock, and he is the president of the corporation. Am-Vak provides welding, fabrication, sand-blasting, and labor services to oil-field concerns. Defendant wholly owns two other companies, Val-Tex Coatings, Inc. and Val-Tex Equipment. These two businesses have occupied the leased premises too, but they have not sublet from Am-Vak. Val-Tex Coatings provides special oil-field painting services, particularly for off-shore petroleum projects, and Val-Tex Equipment supplies machinery to the same concerns.
According to plaintiff's testimony at trial, it was fully discussed and understood between the parties that these business interests of defendant would be located on the leased premises. We note, further, that these businesses clearly fall within the "integral part of lessee's business activity" exception to the clause prohibiting sublease or assignment without approval of plaintiff. Therefore, plaintiff does not and could not successfully contend that defendant breached the lease by the assignment to Am-Vak and the location of the "Val-Tex" companies on the leased premises.
In June of 1977, defendant asked plaintiff to approve the assignment of a security interest in Am-Vak's lease to a Lafayette Bank in connection with a financing arrangement defendant hoped to procure for Am-Vak. Plaintiff would not agree to the assignment, and Am-Vak decided not to press the issue and did not assign any interest in the lease to the bank.
On April 6, 1981, Am-Vak sublet a substantial portion of the leasehold to John M. Kent and a business partner of Mr. Kent. Mr. Kent and his partner, on that same day, sublet their interest to Blast Abrasives, Inc. Mr. Kent is the chairman of Blast Abrasives. Plaintiff's permission was not sought for these subleases, nor for any subsequent subleases or assignments.
Blast Abrasives supplies sand to oil-field service companies for use in their sand-blasting operations. Am-Vak is a customer of Blast Abrasives, and Am-Vak also recommends the use of Blast Abrasives' sand to companies that Am-Vak services. Mr. Kent owns all of the stock in Blast Abrasives, which is a Louisiana corporation, and he also owns all of the stock in Best Barite, which is an Oklahoma corporation.
Best Barite is in the business of grinding barite to small particles which are used as a component in "drilling mud." Drilling mud is a viscous liquid substance that is injected into an oil well during the drilling process. The mud provides lubrication, floats dirt and rock away from the drill-bit and back to the well opening, and maintains well pressure, which prevents blow-outs from occurring. Best Barite grinds and stores some of its product on the subleased property of Blast Abrasives, but it is not a sublessee of Blast Abrasives. Mr. Kent testified that his barite operations in Louisiana are under the auspices of Blast Abrasives, and that Best Barite is simply used as a local trade name.
Another oil-field service concern, Sherwell, which is a subsidiary of Sherwin-Williams Paint Company, apparently occupied the premises for a short period of time. Sherwell manufactures and sells chemicals which are used in the formulation of drilling mud.
As part of a financing arrangement, Mr. Kent and Blast Abrasives have assigned a security interest in Blast Abrasives' sublease to Jefferson Bank and Trust Company.
Testimony at trial sheds light on the concerns of defendant and plaintiff when they were negotiating and formulating the lease. Plaintiff wanted, as much as feasible, to prevent subleases and assignments, because she wanted
"one person to go to if I had problems, one person to answer to me. And, I didn't want my place cluttered up with half a dozen different companies that I didn't have control of because itI didn't want to run the riskI like my farm and I didn't want to have itwhat I had left *1367 I wanted to enjoy itI got along fine with Mr. Vallot, we had no problems."
Conversely, defendant understood the risky nature of the business he intended to conduct on the leasehold. He knew that the oil business could boom and then bust (which subsequently occurred) in a moment's notice. He wanted as much freedom as possible to adapt the land to a use or several uses which could provide him with a profit, or at least prevent financial ruin.
The parties, both represented by able counsel, bargained for and reached a fair and equitable agreement on the provision that governs sublease and assignment of the leasehold. We hold, as did the trial judge, that defendant has met his obligations under the lease agreement.
Clearly, under any common understanding of the phrase, all businesses that have subleased or otherwise occupied the leasehold have been engaged in "related industries." Plaintiff argues that "related industries" means businesses owned in whole or in part by defendant. We note that the preceding alternative condition that allows sublease without lessor's permission if the sublease constitutes an "integral part of lessee's business activity" would be meaningless if we accepted plaintiff's contention. See La.Civ.Code arts. 1945, 1948, 1951, 1955. "Related industries," in the common sense of the phrase, see La.Civ.Code art. 1946, is certainly broad enough to cover the oil-field service concerns that have occupied the leasehold. Plaintiff's valid concern about numerous companies on her land must give way to the clear wording of the contract that she entered into, which allows numerous companies to be on the land if they meet the contract requirements. Moreover, we note that plaintiff's primary concern has been incorporated into the lease agreement, because defendant remains the person who, ultimately, must "answer to" plaintiff. The lease contract provides that he must ensure that all sublessees, assignees, or occupants of the leasehold meet the obligations of the lease, because he may "not be released from the obligations of [the lease agreement]."
The only sublease or assignment activity on the part of sublessees that arguably contravenes the lease is the security assignment by Kent and Blast Abrasives to Jefferson Bank and Trust Company. Initially, we note that this matter was not discussed at trial nor mentioned by the trial judge in his reasons for judgment, and plaintiff does not press the issue in her brief. However, the security assignment is entered into the record as plaintiff's exhibit, therefore, we will consider this issue.
As noted above, the conclusion of the lease paragraph concerning assignment and sublease effectively extends the limitations on assignment and sublease to subsequent sublessees and assignees. Therefore, Blast Abrasives and Mr. Kent may not sublet or assign without plaintiff's permission if defendant could not sublet or assign without plaintiff's permission under the same circumstances. Unless the assignment to the bank falls under the integral part of business activity or related industries exceptions in the lease clause, the lease was breached by that assignment.
Blast Abrasives is not subleasing to the bank so that the bank may open a branch office on plaintiff's land, which would be neither a related industry nor an integral part of Blast Abrasives' business activity. Rather, Blast Abrasives is furthering its business activity on the leasehold by using its interest in the land as collateral. The bank has not taken over any part of plaintiff's land, and the land continues to be used for oil-field service industries. All knowledgeable business persons, including plaintiff and defendant in this case, should agree that financing arrangements such as that utilized by Blast Abrasives are an integral part of the oil-field service business.
We find that Blast Abrasives' security assignment is allowed under the lease clause which provides that permission need not be obtained from lessor for assignments or subleases that constitute an integral part of lessee's business activity. The trial judge did not err by finding that the *1368 lease provisions restricting assignment and sublease have not been breached.
DID DEFENDANT BREACH THE LEASE BY LAYING CLAIM TO AND ATTEMPTING TO POSSESS PORTIONS OF LESSOR'S LAND NOT SUBJECT TO THE LEASE?
The resolution of this issue turns on two acts of defendant and his assignees and sublessees.
First, plaintiff contends that the lease was breached when a power-line right-of-way was granted across plaintiff's unleased land by lessees. The right-of-way was originally granted on a form supplied by Gulf States Utilities, the language of which effectively stated that the lessees owned plaintiff's land. The trial judge found that this error was committed in good faith, and occurred as a result of a "casual" transaction between lessees and an inexperienced Gulf States employee with no legal training. We further note that, as soon as the error was discovered, the lessees and Gulf States offered to correct it. Moreover, under the lease, lessees have the right to utilities which, under the circumstances, necessarily includes a power-line right-of-way across plaintiff's unleased land. The trial judge found that the execution of the right-of-way form was a harmless error that in no way evidenced an intention on the part of lessees to acquire title to plaintiff's property. We agree.
Second, plaintiff contends that road construction by Mr. Kent and Blast Abrasives breached the lease, because the construction occurred, in part, on plaintiff's unleased property. There was no survey conducted at the inception of the lease to establish lease boundaries. Mr. Kent began the construction under a good faith belief that the boundary of the lease was an old fence row, when, in fact, the leasehold did not extend to the fence row. The trial judge found that the construction on plaintiff's unleased property was the result of "an honest mistake." We agree. We note, further, that the error was corrected as soon as it was pointed out to Mr. Kent, and that no damage occurred to plaintiff's property.
Neither of these two innocuous, good faith errors constitute a breach of the lease. Defendant and his assignees and sublessees were acting as good administrators of the leased property when the errors were committed, and both errors were subsequently corrected. See La.Civ.Code art. 2710. Defendant did not breach the lease by laying claim to unleased portions of plaintiff's land; in fact, no real claim of ownership has ever been made by defendant or his assignees and sublessees.

SUMMARY
Defendant has not breached the lease, nor is there a failure of the lease agreement at its inception. Based on the above reasons, the judgment of the trial court is affirmed at plaintiff Velma Myers Lancon's cost.
AFFIRMED.
NOTES
[1] The trial judge concluded that plaintiff did not timely notify defendant that the insurance certificate and policies that defendant provided to plaintiff were not in compliance with the lease or that the insurance coverage defendant procured for plaintiff was inadequate. We conclude that the certificates and policies meet the lease requirements and that the coverage provided is adequate; therefore, any notification by plaintiff to defendant concerning the documents or coverage is irrelevant. The trial judge did not award damages to plaintiff. Because we agree with the trial judge that defendant has not breached the lease agreement, plaintiff may not be awarded damages.
[2] For example, North-West Insurance Company of Oregon, which was heavily involved in the same type of Louisiana oil-field service risk underwriting undertaken by International Surplus in this case, may be liquidated by the Oregon Insurance Commission. Claims against oil-field service companies covered by North-West have, over the past few years, substantially surpassed the premiums paid by these companies. See Times-Picayune States-Items (New Orleans), Oct. 20, 1984, at Al. Because of the enormous risks inherent in the oil-field service industry, only a small number of companies are willing to underwrite policies for industry participants at a feasible price. Most underwriters that accept oil-field service industry risks are largely dependent on that industry for their business, and lack the diversification of risks favored by most insurers in general. Therefore, an unexpected climb in liability among oil-field service companies may decimate the finances of these underwriters. See id.