302 So.2d 345 (1974)
Evelyn HADRICK, widow of Jessie W. Hadrick, Individually and as Administratrix of the minors, Gwendolyn Hadrick, et al.
v.
Norman DIAZ et al.
No. 9908.
Court of Appeal of Louisiana, First Circuit.
October 14, 1974.
*346 Herman C. Hoffmann, Jr., Monroe & Lemann, New Orleans, for Diaz.
Joseph F. Bishop, Jr., New Orleans, for plaintiff-appellee-appellant.
David L. Campbell, New Orleans, for defendants Harrison and Aetna.
John I. Moore and A. Michael Dufilho, Baton Rouge, for Nadler.
Robert L. Morris, Houma, for intervenor Aetna.
Before LANDRY, BLANCHE and NEHRBASS, JJ.
LANDRY, Judge.
The appeals herein are from a judgment dismissing wrongful death and survival actions filed by Mrs. Hadrick, individually and on behalf of her minor children, and the major children of the deceased, upon defendants' motions for summary judgment. The main action is based on the death of Jessie W. Hadrick who was killed in an industrial accident which happened during the course and scope of decedent's employment by J. Aron & Co., Inc. (Aron), a Louisiana corporation domiciled in Orleans Parish, which said corporation owns and operates a sugar refinery in Supreme, Louisiana, under the name of Supreme Sugar Refinery (Supreme). The accident occurred on October 13, 1971, *347 while decedent, together with his immediate superior, Norman Diaz (Diaz), was cleaning an evaporator in Supreme's mill, at the beginning of the 1971 sugarcane grinding season. The evaporator in question was manufactured for Supreme by Nadler, Inc. in or about 1952. While cleaning the evaporator with a solution of muriatic acid and water, heated by steam, decedent was fatally burned when a manhole cover on the evaporator popped open spilling its heated contents onto decedent and Diaz who were attempting to seal a leak. Made defendants in the main demand are: Diaz, Process Superintendent at Supreme's sugar mill; Joseph (Jan) Bergeron, General Superintendent, Supreme's sugar mill; Joe Harrison, Vice President of Operations, in charge of Supreme's sugar mill, and Aetna Casualty and Surety Company (Aetna), liability insurer of Aron's executive officers. Nadler, Inc., manufacturer of the evaporator (Nadler), was also made defendant. The liability of Diaz, Harrison, Bergeron and Aetna is asserted on their alleged negligence as Aron's executive officers. Nadler is alleged to have been negligent in its manufacture of the evaporator.
Bergeron was never served with process. On behalf of itself and Harrison, as an executive officer of Aron, Aetna answered the petition and moved for summary judgment dismissing plaintiffs' claims. Aetna declined to defend Diaz as an executive officer of Aron. Diaz answered the main demand and jointly moved for dismissal of plaintiffs' claims upon summary judgment. Diaz also filed a third party demand against Aetna seeking penalties, attorney's fees and costs because of Aetna's failure to defend him. Nadler also moved for summary judgment dismissing plaintiffs' main demands. As compensation insurer of Aron, Aetna intervened claiming payment by preference out of any award to plaintiffs of sums paid plaintiffs as workmen's compensation benefits.
The trial court granted the joint motions for summary judgment filed on behalf of Diaz, Harrison and Aetna as defendants in the main demand. The trial court also granted the motion for summary judgment by defendant, Nadler, Inc., against plaintiffs. Diaz's third party demand against Aetna was dismissed on Aetna's motion for summary judgment. Aetna's intervention for recovery of compensation benefits paid was not ruled on apparently because the main demand fell. Plaintiffs have appealed; Diaz has appealed rejection of his claim against Aetna. In addition, Aetna, as intervenor, has appealed dismissal of plaintiffs' suit. We affirm on all counts except dismissal of Diaz's third party demand against Aetna.
In substance plaintiffs' petition alleges that Diaz, decedent's immediate superior and supervisor, breached the duty of care owed decedent by requesting decedent to accompany Diaz to the evaporator or pan floor of the sugar refinery to clean a vessel known as an evaporator, which vessel contained boiling muriatic acid. It is claimed that Diaz knew or should have known decedent lacked proper safety equipment to safely perform the work, and also that decedent was not properly instructed and trained in the performance of the work by Diaz. Harrison is alleged to have been negligent in that he knew or should have known that a safety device which should have been on the evaporator was not on the vessel at the time of the accident. Bergeron's alleged negligence is no longer of any concern inasmuch as that defendant was never served with process, and no judgment was rendered against him. Aetna's liability is asserted under its policy covering Aron's executive officers, including Diaz and Harrison.
In passing upon a motion for summary judgment, the court must decide whether the pleadings, depositions, answers to interrogatories and admissions on file, together with such affidavits as the parties may have submitted, show the absence of a genuine issue as to material fact, and that mover is entitled to summary judgment as a matter of law. LSA-C.C.P. art. 966; *348 Auto Owners Insurance Company v. Freret et al., 280 So.2d 638 (La.App. 1st Cir. 1973).
The party moving for summary judgment bears the initial burden of convincingly establishing the absence of a genuine issue of material fact, which burden is such that all reasonable doubt shall be resolved in favor of trial on the merits. LSA-C.C.P. art. 967; Auto Owners Insurance Company, above.
The record contains interrogatories propounded to and answered by Diaz; depositions of Diaz, Bergeron and Harrison, taken on behalf of plaintiffs, and affidavits of Diaz and Harrison submitted on behalf of Diaz. In determining whether the trial court properly sustained the motions for summary judgment leveled at the main demand, we must decide whether the facts thus presented show an absence of a disputed issue of material fact and, if so, whether, as a matter of law, defendants are not liable to plaintiffs.
The interrogatories, depositions and affidavits disclose that decedent had been employed by Supreme for several years during which time decedent worked in different areas of the refinery. At the beginning of the 1969 grinding season, which lasts from approximately mid-October to mid-December, annually, decedent, at his own request and under union seniority contract provisions, was transferred to the evaporator or pan floor. The refinery is equipped with a bank or series of five evaporators, which in essence are large vessels designed to remove the excess water from sugar cane juice by evaporation in the process of sugar refining. Each evaporator consists of a large vessel equipped with pipes for the admission and extraction of fluids, including cane juice to be processed, as well as liquid chemicals used in the periodic cleaning of the vats, tubes, valves and other similar components.
Each evaporator is equipped with a circular "manhole" situated about four feet above the floor. The manhole is designed to admit entry into the vessel for inspection and cleaning. When an evaporator is in use or being cleaned, the manhole is secured by a cover. As one faces the evaporator directly in front of the manhole, the cover opens from one's right to left. Leakage of liquids from the manhole is prevented and controlled by means of a rubber gasket which is placed around the perimeter of the opening. The manhole cover is equipped with a metal bar or rod, one end of which is secured to a hinge affixed permanently to the body of the vessel a few inches left of the manhole opening. From this hinge on the left, the bar is attached to the outside of the manhole cover; it runs across the center of the cover's face and extends some distance beyond. The end of the rod opposite the aforementioned hinge is cut in the form of a "Y". When the cover is closed, the "Y" end of the bar rests on the exterior of the evaporator with the "Y" several inches to the right of the manhole opening. Where the "Y" rests on the outer surface of the evaporator, a hinged threaded bolt is affixed to the exterior of the vessel. The bolt is so constructed and situated that it can be moved upright between the prongs of the "Y". With the bolt upright between the "Y" prongs, the bar is held securely in place by putting a washer over the bolt and screwing a nut onto the bolt. To maintain a seal sufficient to prevent leakage, the manhole cover is equipped with a small wheel situated at its center. The wheel is attached to a threaded bolt. In a manner not fully explained in the record, it appears that, by turning the wheel, pressure is applied to the manhole cover tightening it against the rubber gasket seal. If a leak is detected while the evaporator is in use, the leak is stopped simply by turning the wheel until enough pressure is applied to obtain a perfect seal.
Live steam furnishes the heat required in the evaporation of cane juice in the refining process. Steam is also employed to heat a mixture of muriatic acid and water used to clean the evaporators. It appears that the evaporators are cleaned each year *349 before commencement of the grinding season; they are also cleaned about once weekly, or as otherwise required, during the season. The record does not clearly explain just how steam is employed. It appears that steam passes through the vessel in or through tubes or pipes to heat the liquid in the evaporators; it is clear, however, that in the process steam does not mix with the contents of the evaporator in either the cleaning or refining process. To clean an evaporator, a solution of acid and water is introduced into the vessel to a height above the top of the manhole cover, but not sufficient to completely fill the container. Steam is then applied to heat the mixture to about 220 degrees, which temperature is maintained for a period of one to five hours depending on the interior condition of the evaporator. After this process is completed the water and acid solution is withdrawn. The interior is then inspected and, if found necessary, further cleaning is done by means of a solution of water and soda which is also heated.
Defendant was the senior man on the pan floor. He had served in such capacity for two previous grinding seasons. At the time of the accident, the refinery was being readied for the 1971 grinding season. Prior to decedent's being permanently assigned to the number one post on the pan floor, decedent had been given at least two weeks on the job training by Diaz, with Harrison's knowledge and approval and under Harrison's supervision to a limited degree. From time to time, Diaz questioned decedent about the job to be sure that decedent understood his duties. Required safety equipment for workers on the pan floor consisted of the use of monogoggles only. These were supplied by Supreme. Hard hats and safety shoes were also available for workers who desired them, but their use was not compulsory.
On the date of the accident, Diaz instructed decedent to clean evaporator number one. Diaz checked from time to time to see that the process was conducted according to usual procedure. After the acid solution was introduced and heated to about 220 degrees, decedent apparently decided to check the manhole. At the time, decedent and Diaz were on the side of the vessel opposite the manhole. Decedent went around to the other side and remained. Diaz decided to investigate and found decedent in the act of turning the manhole cover wheel to stop a slight leak or drip at the botton of the manhole cover. Diaz positioned himself to decedent's right between decedent and the end of the manhole cover beyond which the "Y" extended, in which position decedent was protected somewhat by the cover which opened from right to left. Thus positioned, Diaz reached up to assist decedent in turning the wheel to tighten the cover. Diaz heard a popping noise "like a balloon bursting", and immediately the cover opened spilling the contents of the evaporator onto Diaz, decedent and the floor of the pan room. Diaz immediately ran to a water hose situated about 15 feet distant and washed himself off. He then looked back and could not see decedent because of the steam emanating from the evaporator and heated liquid. Decedent apparently fell to the floor in a pool of liquid estimated at four to six inches deep. Decedent apparently then ran from the area to a nearby roof where he was found by fellow workmen and taken to a hospital.
The question of whether an agent may be held liable in tort to a third person for injury resulting from breach of a duty owed by the agent to his corporate employer, who is also the employer of the injured party, is a matter which has long plagued the courts of this state. Numerous decisions of the various Courts of Appeal have espoused different views on the subject over the years as observed in the recent decision handed down by the Supreme Court in Canter v. Koehring Company, La. 283 So.2d 716. Canter, above, considered the jurisprudence in detail and resolved the conflicts which resulted from the differing views expressed by the Courts of Appeal. We see no useful purpose to be served by *350 again reviewing the conflicts noted and disposed of in Canter, above. It suffices, we think, to note that Canter has put the matter at rest by establishing definite criteria for resolution of the issue presented.
Canter expressly provides that liability of an agent to a third party attaches, in cases of this nature, where:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its nonperformance or mal-performance and has nevertheless failed to cure the risk of harm."
We summarize the foregoing to mean that in cases of this nature liability attaches where: (1) The principal or employer owes a duty to the third party, which includes a co-employee, and the breach of the duty is the cause of the injury; (2) The duty owed the third party or injured employee has been delegated by the principal or employer to defendant; (3) The defendant has breached the duty through personal fault, as distinguished form technical or vicarious fault, which personal fault consists of the failure to discharge the duty by the exercise of ordinary care under the circumstances, either through malfeasance, misfeasance or nonfeasance, or upon failing to act upon actual knowledge of the risk to others or failing to exercise ordinary care in discovering and avoiding risks resulting from the breach of duty, and (4) An officer, agent or employee is not personally liable solely because of his administrative responsibility to perform a particular employment function. To be personally liable the agent, officer or employee must owe a personal duty to the injured party, the breach of which obligation is the specific cause of plaintiff's injuries. If a defendant, with due care, has delegated the responsibility to competent subordinates, he is not personally liable to the injured party for the negligent performance of the duty unless he personally knew or should have known of the failure to perform and failed to remedy the risks resulting from nonperformance.
We dispose of Harrison's alleged liability merely by noting that such duty as Harrison may have owed decedent had been delegated to and assumed by Bergeron *351 and Diaz, both of whom are shown by the depositions to be competent and efficient. Additionally, the depositions show that Harrison was not personally aware of any dangerous condition or any failure on the part of Bergeron or Diaz to perform a duty owed decedent. Under these circumstances, Harrison cannot be personally liable to plaintiffs. Canter, above.
Diaz's alleged failure to provide decedent proper training, instruction and supervision is clearly refuted by the depositions. As noted previously, Diaz was given on the job training which qualified him to fill and hold the position through two grinding seasons without incident. On the day of the accident, Diaz was personally present and fulfilling his supervisory duties as evidenced by his checking on decedent from time to time and actually assisting decedent.
The depositions clearly refute the contention that decedent was not provided with proper personal safety equipment. They show that monogoggles are the only safety devices generally furnished to and used by pan floor employees in sugar refineries. Decedent was wearing such equipment at the time of the accident. No other equipment was required under the employer's rules and safety regulations. From the depositions we conclude it would be manifestly unreasonable to hold that such an occurrence was reasonably foreseeable, and that protective clothing of some nature should have been provided.
The claim that decedent was not furnished a safe place in which to work is likewise clearly refuted by the depositions. It is shown that the evaporators, pan floor and surrounding area were constructed, operated and maintained according to practices generally accepted in the industry as safe and sound. It is clear there was no explosion as alleged by plaintiffs. The evaporators were built to a design commonly employed in the industry. The vessel in question had been in use for many years without incident or mishap. The depositions reflect there was no reason to suspect or anticipate a malfunction due to deterioration, or ordinary wear and tear. The manhole cover in question had been successfully opened and closed, without accident, on innumerable occasions. Decedent himself had personally handled the process for two seasons and was thoroughly experienced in the matter.
After the accident, the securing device on the manhole cover was examined by Bergeron and Harrison. They found nothing wrong. Each noted that the mechanism was intact and working properly when the bolt was placed between the prongs of the "Y" and correctly secured. Diaz opined the cover opened because the hinged bolt had not been properly inserted between the prongs of the "Y" and slipped out when pressure was applied by decedent in attempting to stop the drip. As an added safety precaution, however, an additional device was designed and installed. It consisted of a pin inserted through the prongs of the "Y", which device was to hold the bolt in place in the "Y". Appellants would urge that this modification of design indicates its prior dangerous, unsafe construction and consequent failure to provide employees a safe environment in which to work.
It is well settled that taking extra precautionary measures following an accident is not necessarily an admission or evidence of negligence. Pitre v. Employers Liability Assurance Corp., 234 So.2d 847 (La.App. 1st Cir. 1970).
Bergeron's and Harrison's depositions show that the added safety device is not standard in the industry, but that it was installed by them purely as an extra precautionary measure, even though they considered decedent's accident had apparently happened due to human error. These depositions also clearly show that the prior device was practical and safe if properly used.
A considerable portion of the depositions was devoted to plaintiffs' attempt to show *352 that Diaz was negligent in failing to properly supervise decedent in the cleaning operation, including Diaz's failure to personally check the manhole cover before the operation began. It appears that Diaz was personally present and checked with Hadrick from time to time to see how the process was going. Matters proceeded routinely until decedent went to the opposite side of the evaporator to check things out. When decedent remained for what Diaz considered an unduly long period, Diaz went to investigate. Diaz found decedent tightening the manhole cover to stop a small leak. His reaction was to help decedent turn the wheel. We find no negligence on Diaz's part in failing to personally check the manhole cover either before the cleaning began or before attempting to aid decedent in stopping the leak. Had Diaz examined the cover before the operation began, he would have found it apparently in perfect order and condition. This is necessarily so because the cover closed properly immediately following the accident. It was decedent's job to close and secure the cover. Decedent was thoroughly experienced in the matter. It was reasonable for Diaz to assume that decedent had properly closed the cover. We find no negligence on Diaz's part in failing to check the cover immediately before assisting decedent in the tightening operation.
On the basis of the depositions and interrogatories, we conclude that, as a matter of law, neither Diaz nor Harrison breached a duty owed decedent within the criteria established by Canter, above.
Diaz's appeal presents the simple issue of whether Aetna was required to defend Diaz herein as an executive officer of Aron. Although the issue is simply put, its resolution involves application of principles which are most perplexing.
Thibodeaux v. Parks Equipment Company, et al., 185 So.2d 232 (La.App. 1st Cir.), concerned the question of whether a chief engineer and foreman of one of numerous shop bays were corporate executive officers within the purview of a policy similar to that issued by Aetna in this instance. Relying heavily upon and quoting extensively from Bruce v. Travelers Insurance Co., 266 F.2d 781 (Fifth Circuit, 1959), and Employers' Liability Assurance Corporation, Ltd. v. Upham, La.App., 150 So.2d 595, Thibodeaux held such employees were not executives. Thibodeaux held in essence that corporate executive implies some sort of managerial responsibility for the affairs of the corporation generally, and also imports a close connection with the board of directors and high officers of the corporation. Thibodeaux also declared that the distinction between an employee and an officer or executive is not determined by the nature of the work performed, but by the nature of the relationship of the particular person to the corporation. Upham, above, involved a carpenter foreman in the employ of a general construction company. In deciding that the employee, Shane, was not an executive officer, Upham also relied upon and cited the general principle announced in Bruce, above, that an executive is generally understood to mean someone having managerial responsibilities for the affairs of the corporation generally; that it imports a close relationship with the board of directors and high corporate officers, and that the distinction between employee and executive is not determined by the nature of the work done by the individual, but by the nature of the relationship of the particular individual to the corporation.
Berry v. Aetna Casualty & Surety Company, 240 So.2d 243 (La.App. 2d Cir.), involved the question of whether the plant manager of Libbey-Owens-Ford's plant at Shreveport, Louisiana, was a corporate executive. Mambourg, the manager, was in charge of between 550 and 650 employees, including numerous department heads who reported directly to him. In the chain of command beneath the department heads *353 were a foreman or supervisor, following which there were shift superintendents with supervision over hourly laborers. Overall responsibility for plant management rested with Mambourg who reported directly to a vice president in charge of both window glass plants, including the Shreveport installment. Mambourg had authority to discharge employees, but ordinarily consulted his immediate superior before doing so. Mambourg was deemed an executive because he served directly under a corporate officer and participated in the formulation and execution of company policy with respect to all areas of production at the Shreveport plant. Berry, above, might be interpreted to conflict with the principles applied in Thibodeaux and Upham, above, in holding that an executive need not necessarily be an employee who has managerial responsibilities for the affairs of the corporation generally, but could be one who exercises managerial responsibility concerning a particular phase or aspect of a corporation's business or of a particular plant or installation.
Further considering Thibodeaux, above, we do not view that decision as holding that managerial responsibility for the affairs of a corporation generally is an indispensable prerequisite to the status of corporate executive. Said element is but one of the numerous factors to be considered in such a determination.
In determining the issue before us, our own courts have considered the following circumstances relevant: (1) Whether the employee's position was created by corporate charter, Thibodeaux, above; (2) Whether the employee was formally elected or designated to his office or position by the Board of Directors, the officers or stockholders, Thibodeaux, above; (3) Did the employee have authority, discretion and managerial responsibility covering the divergent affairs of the corporation, Thibodeaux, above; (4) Did the employee have duties or authority outside his particular department, Thibodeaux, above; (5) Was the employee involved in shaping company policy, Thibodeaux, above; Berry, above; (6) Did the employee possess authority to alter contract terms or conditions or to change specified company procedure, Upham, above; (7) Whether the employee had several department heads under his supervision, Berry, above; (8) Whether the employee had a large number of employees under his direction and control, and (9) Did the employee have authority to hire and fire other employees, Berry, above? In Guillory v. Aetna Insurance Company, 415 F.2d 650 (Fifth Circuit), the court also considered whether the employee maintained a close connection with the corporate officers and board of directors and whether the employee was empowered to write company checks.
Aron's organization diagram appears of record. Its top officer is a president, beneath whom is a single Senior Vice President. The company's operations are ostensibly divided into three categories, namely, a coffee department, a sugar department, and a finance and general accounting section. The sugar department is headed by a Vice President and General Manager, who is in charge of the entire sugar operation, and, as such, accountable directly to the Senior Vice President. Beneath the Vice President and General Manager of the Sugar Department is Harrison with the title of Assistant Vice President and General Manager. Harrison's deposition shows that he is in charge of the sugar refinery and mill with complete general authority and responsibility in the matter of its operation. Next under Harrison was Bergeron, who no longer works for Aron. As General Superintendent, Bergeron's duties consisted of overall supervision of plant process and maintenance. Diaz, with the title of Process Superintendent, was directly under Bergeron.
*354 In answer to interrogatories propounded by plaintiffs, Diaz admitted he had authority to hire and fire personnel. In his deposition taken by plaintiffs, Diaz reiterated his authority to fire, but implied that hiring was done by the personnel officer. Affidavits of Harrison and Diaz offered in opposition to Aetna's motion for summary judgment allege that, as process superintendent, Diaz's authority and duties included managerial responsibility for practically the entire operation of the sugar refinery; participation in the formulation of company policy concerning operation of the refinery; authority to negotiate and execute contracts binding on the corporation; working closely with the corporate officers in the day to day operation of the refinery; supervision of between 120 and 140 employees, and authority to hire and fire employees. All such phases of Diaz's employment are relevant in determining his status as alleged corporate executive. The mentioned affidavits place at issue material facts necessary to a determination of Diaz's status. Under the circumstances, Aetna's motion for summary judgment was improvidently granted below.
The judgment of the trial court granting the motions for summary judgment filed by defendants, Harrison, Diaz and Aetna, dismissing the claims of plaintiff, Evelyn Hadrick, individually and as administratrix, and those of the major Hadrick children, is affirmed. The judgment of the lower court granting the motion for summary judgment filed by defendant, Aetna, dismissing the claim of third party plaintiff, Diaz, is overruled and set aside, and this matter remanded to the trial court for trial of said third party demand. All costs of these proceedings to date, including costs of these appeals, shall be paid one-half by plaintiffs, Evelyn Hadrick, Darwin Hadrick, Reginald Hadrick and Barbara Hadrick, and one half by Aetna.
Affirmed in part, reversed in part, and remanded.