407 So.2d 1277 (1981)
Benjamin JOSEPH, et al.
v.
Elwood ALBARADO, et al.
No. 12161.
Court of Appeal of Louisiana, Fourth Circuit.
December 8, 1981.
Rehearings Denied January 21, 1982.
*1279 Talbot, Sotile, Carmouche, Waguespack & Marchand, Victor L. Marcello, Donaldsonville, for Benjamin Joseph and Lillian Joseph, plaintiffs-appellees.
Frank J. Achary, Metairie, for Carl Ott, Jr., defendant-appellant.
Owen, Richardson, Taylor, Mathews & Atkinson, Daniel R. Atkinson, Baton Rouge, for Kent Enterprises, Inc., defendant-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John C. Combe, Jr., New Orleans, for Larry Townsend and Liberty Mut. Ins. Co., defendants-appellants-appellees.
William V. Renaudin, Jr., and Kenny M. Charbonnet, New Orleans, for Liberty Mutual Ins. Co., defendant-appellant-appellee.
Before BOUTALL, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
Plaintiff Benjamin Joseph and defendants Carl Ott, Jr., Kent Enterprises, Inc. (Kent),[1] and Liberty Mutual Insurance Company (Liberty)[2] appeal a district court decision in favor of the plaintiff and against the defendants. The judgment decreed that Ott, Kent, Carlton Yarbrough and Elwood Albarado (as executive officers of South Louisiana Contractors, Inc. [SOLOCO]) were negligent and this negligence was a proximate cause of the plaintiff's injuries. It further declared the judgment was against those defendants, in solido, in the amounts of $50,000 for past, present and future pain and suffering; $5,719.80 for medical expenses and $3,920 for lost wages, together with legal interest thereon until paid and all costs.
It was also stated, as part of the trial court judgment, that the plaintiff was not negligent nor did he assume the risk of his injury and that Liberty was subrogated to the rights of plaintiff to be reimbursed by preference for all compensation payments made to plaintiff and all medical expenses paid for plaintiff past, present and future. Larry Townsend, Norris Pitre, Joseph C. Wiltz, Carroll Mabile and K. C. Forest Products were also declared not negligent and were dismissed as parties defendant.
Additionally, the various appeals filed in this case have been answered by Ott, Liberty (as intervenor) and Joseph. Defendant Elwood Albarado has not appealed the district court decision.
At a trial on the merits of the case Joseph testified that at the time of the accident, September 11, 1976, he was working as a general laborer for SOLOCO and had been so employed for the previous six or seven years. He said on that date he was called by his foreman, Albarado, from the work he was doing (nailing boards) to help "spot pilings."
Joseph explained he had done this type of work before, but not often, and the only instruction he had ever been given was to hold the pilings over the stake.
In describing the procedure, Joseph said the dragline operator, Mabile, would winch up the piling attached to a cable and a chain, which was then hoisted into the air, inserted into a cage-like device and brought over to the stakes in the ground. He then would grab the piling when it was at waist level and hold it or steady it until it got to the ground. Joseph further testified he was struck on the lower part of his back *1280 and shoulder before falling forward on his knees and said the accident happened so quickly he did not know what hit him. On cross-examination Joseph also said he had seen a branch or knots on the piling but "did not think they made any difference."
Albarado testified that at the time of the accident Norris Pitre was working with him but Pitre was also a foreman. He said his own supervisor was Carlton Yarbrough but he was not on that particular job site all the time. He added that the three foreman at the Boutte location each took care of his own men.
Albarado said that although he did not see the plaintiff as he was struck, he did see him as he fell to the ground. He added there was an 8- or 9-inch branch on the piling which must have hit him because "that is the only thing I could see."
Also Albarado stated that before the accident he observed Joseph "doing his job like he was supposed to"; that the plaintiff was responsible for looking down as he spotted; and that no one at SOLOCO was responsible for checking pilings before they were used. He said he did not warn Joseph about branches on the pilings because there were never any before. He estimated the branch he saw was approximately 15 feet from the bottom of the piling but only about 3 feet from the ground by the time he arrived at where the plaintiff had fallen after the accident. He also said his job was to look at the man on the lead so he did not see the branch on the piling prior to the accident, and he stated these pilings were delivered to the Boutte site by a Kent truck.
Carroll Mabile, the dragline operator for SOLOCO at the accident site, said he did not see any branch on the piling in question but that he was not looking for any because there "wasn't supposed to be any on these." He also said that when he let the piling go down, it sometimes went down 9 or 10 feet by itself due to marshy ground.
Johnny Carville, safety director at SOLOCO at the time of the accident, identified documents evidencing the sale of pilings from Kent to SOLOCO in September of 1976 and testified these were the only records found by him in this regard after a search of SOLOCO files. He said Townsend, the branch manager, did not have the authority to tell him when to hold safety meetings. He also said the meetings he held were mainly for the pushers and supervisors and that he depended solely on the pusher or foreman to pass on what he had learned to the crews. He testified he has been on many jobs but has never seen a branch or knot sticking out of an untreated piling.
Carlo Triola, office manager of Kent, stated that in September of 1976 Kent obtained all of its untreated pine pilings from Carl Ott, Jr., and, although Kent also did business with K. C. Forest Products, during that time period there were no purchases from that company. He also said the pilings were always picked up by his own company's trucks and if they were not satisfactory, the driver would reject them. He stated that piling is not stocked by Kent but purchased by it when it receives an order.
Carl Ott, Jr., testified the nature of his business is producing poles and pilings. He said trees are cut down to meet the specifications of an order and all the limbs are removed by a power saw out in the forest. He added there are supervisors in the field who inspect the pilings to see if there are any limbs on them when they are loaded on the truck.
Ott said the ultimate responsibility for determining that the pilings are prepared properly according to order rests with those in charge at its final destination. He also said he himself occasionally inspects the preparation of these pilings.
Felix Truxillo testified he had done pile spotting for SOLOCO and received "a little" instruction on how to do it from Albarado. He stated he was never warned about limbs or branches. He said that although he had worked for seven years for SOLOCO prior to this accident, he had never attended a safety meeting and only received safety instruction from Albarado. Truxillo said *1281 he was driving the truck the day of the accident but he was not responsible for inspecting the pilings nor did he know of anyone else who was responsible for inspecting them before they were used.
Norris Pitre stated he was riding the leads on the pilings for SOLOCO at the time of the accident and that the lead was a "swinging" type. He said after the accident he saw a little bruise spot on the plaintiff's shoulder, but he did not know what had happened. He also stated that in his position on the job he could not see the person spotting and he had never seen branches on pilings before this incident occurred. He added that only the foremen at SOLOCO attended safety meetings and he had learned to spot pilings only by watching others do it.
Ura Sims, also employed by SOLOCO for 10 or 11 years at the time of the accident, said he was at that time "butting" the pilings or trimming the ends off with a power saw. He said after the accident, he did not see a branch but saw a hole or groove in the ground which could have been made by it. He also stated he rode home with the plaintiff after the accident and Joseph complained of shoulder pain.
Sims testified he had previously sawed off branches or knots he noticed on pilings, and he said a person standing beneath a piling would not always be able to see a branchit would depend on which side of the piling it was on.
Allen Smith, who was overseer of Ott's pole yard in September of 1976, testified that pilings were brought into the yard where they were classified as to length and diameter and inspected. He said if a branch was noticed a saw hand would be called to cut it off. He also said that in the three and a half years he was with Ott he had never had a complaint regarding knots or limbs. He admitted it was one of his functions to remove all limbs before the pilings were shipped. He said he did not feel it was the responsibility of drivers picking up the pilings to inspect them.
Larry Townsend, manager of the Thibodaux branch of SOLOCO at the time of the accident, said at the trial that Carlton Yarbrough, deceased at the time of trial, was under his direction at the Boutte site. He said Yarbrough's job as a superintendent was to work with the foremen to see that the job was done and that Albarado, as well as himself, had the authority to hire and fire, although applications for hiring had to be approved by the office. He added it was the pusher or foremen's responsibility to instruct the men as to safety in spotting pilings and that there was no procedure to inspect pilings that were brought to the work sites nor anyone who actually had that specific responsibility. Townsend added that when he receives pilings from a manufacturer or retailer he expects them to be free of limbs.
In giving his reasons for judgment and conclusions of facts, the district court judge stated in part:
"From the evidence, this court finds the following facts proven:
1. The piling involved in the accident had a limb, or branch, some two inches in diameter and some six to eight inches in length protruding from the piling.
2. The piling was cut, cleaned and inspected by Carl Ott, Jr.
3. The piling was sold by Carl Ott, Jr., to Kent Enterprises, Inc.
4. Kent Enterprises, a vendor of, among other things, piling, sold the piling to South Louisiana Contractors, Inc., and delivered the piling to the construction site of SOLOCO in this parish.
5. Kent Enterprises did not inspect the piling before or after delivery to SOLOCO, or if it did, the inspection failed to reveal the protruding limb.
6. SOLOCO did not inspect the piling before placing it in position to be driven into the ground at the construction site, or, if it did, the inspection failed to reveal the protruding limb.
7. The protruding limb was an apparent and obvious defect that could be detected by visual inspection.
*1282 8. In the normal use of piling they are driven into the ground for varied purposes.
9. The primary job purpose of plaintiff was to guide and position the piling above the ground designated for the driving of the piling. This necessitated that plaintiff look downward while positioning the piling.
10. Yarbrough was the Field Superintendent for SOLOCO in charge of the construction at the site in this parish.
11. Albarado was the immediate foreman of plaintiff.
12. As the piling was being driven into the ground, the protruding limb struck plaintiff on the shoulder and caused injury.
"From these facts, the court finds the following conclusions:
1. Carl Ott, Jr., failed to detect and remove the protruding limb from the piling thus rendering the piling unreasonably dangerous for normal use.
2. Kent Enterprises, Inc., failed to detect and remove the protruding limb from the piling thus rendering the piling unreasonably dangerous for normal use.
3. Yarbrough and Albarado failed to have the piling inspected before use thus providing plaintiff with unsafe material to work with and with an unsafe place to work.
4. Plaintiff, in the execution of his duties, was required to look downward and not upward.
"Consequently, this court must find that:
1. Carl Ott, Jr., provided a piling that was unreasonably dangerous for normal use and this defective piling was a proximate cause of the accident.
2. Kent Enterprises sold a piling that was unreasonably dangerous for normal use and this defective piling was a proximate cause of the accident.
3. Yarbrough and Albarado each owed to plaintiff a particular personal duty to provide him with safe materials to work with and to provide him with a safe place to work. Each breached this duty and each breach was a proximate cause of the accident.
4. No act of negligence was proven as to Larry Townsend, Norris Pitre, Joseph C. Wiltz, Carroll Mabile, or K. C. Forest Products. W. W. Goodson and Orville Watson were previously dismissed as party defendants by directed verdict.
5. Elwood Albarado and Carlton Yarbrough each was an executive officer of South Louisiana Contractors, Inc.
6. Carl Ott, Jr., Kent Enterprises, Inc., Elwood Albarado, and Carlton Yarbrough each breached a duty of care owed to plaintiff and are liable in solido to plaintiff for damages. As one joint tort-feasor to another each is liable for his virile share of damages and if any of the tort-feasors is required to pay unto plaintiff in excess of his virile share then he is entitled to contribution from the other tort-feasors."
In the case of Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963), the court said 153 So.2d at 397:
"Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation."
In the present case, although no one actually witnessed the accident in question, the testimony of those at the job site, as summarized above, allowed the trial court to conclude that the plaintiff's injuries were, more probably than not, caused when *1283 he was struck by a limb protruding from the piling he was spotting, and this court can find no manifest error in that conclusion.
Neither does this court find error in the trial court's conclusion that Carl Ott, Jr., breached a duty of care owed to the plaintiff and, therefore, was liable for his injuries. In Weber v. Fidelity & Casualty Insurance Co. of N. Y., 259 La. 599, 250 So.2d 754 (1971), the court said 250 So.2d at 755-756:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
* * * * * *
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them."
In the case of Dixon v. Gutnecht, 339 So.2d 1285 (La.App. 1st Cir. 1976), the court also said at 1289-1290:
"The invocation of strict liability brings with it a corresponding change in the conventional rights and responsibilities of the parties in a delictual action. In essence, it is liability without proof of specific substandard conduct. All that is required is that the plaintiff prove a defect in the product; that at the time of its failure it was in normal use; that it was unreasonably dangerous in that use; and that the injuries were caused by the defect. The defenses in such an action are the negative of any of the above plus the assumption of risk as distinguished from contributory negligence. Hastings v. Dis Tran Products, Inc., 389 F.2d 1352 (W.D.La.1975); and Langlois v. Allied Chemical Corporation, [258 La. 1067, 249 So.2d 133], above."
The court also stated in Cobb v. Insured Lloyds, 387 So.2d 13 (La.App. 3d Cir. 1980), at 17-18:
"* * * In Weber v. Fidelity & Casualty Insurance Company, 259 La. 599, 250 So.2d 754 (1971), the court held a product is defective if `unreasonably dangerous to normal use.' We stated in the case of Avoyelles Country Club v. Walter Kidde & Co., 338 So.2d 379, 382 (La.App. 3rd Cir. 1976) the relevant inquiry is `what was the normal or intended use of the product, and was plaintiff making such normal or intended use of it?'
* * * * * *
"* * * In the case of Fox v. American Steel Building Company, Inc., 299 So.2d 364 (La.App. 3rd Cir. 1974) we stated:
`... the law does not require that the manufacturer make the product "fool proof" or "accident proof." It does require, however, that it exercise reasonable care in the design and fabrication of its products which are of such a nature that, if not carefully made, can cause foreseeable injury to persons using the products for purposes which the manufacturer may reasonably expect them to be used. Failure of the manufacturer to exercise such care renders it liable if injury results from the lawful use of the product in a manner and for a purpose for which the manufacturer may be deemed to reasonably expect. Leathem v. Moore, 265 So.2d 270 (La. App. 1st Cir. 1972); Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.App. 3rd Cir. 1971) supra.'
"Normal use is a matter of foreseeable use and may include something broader than operation exactly in accordance with the manufacturer's instructions. See, Fox v. American Steel Building Company, Inc., supra; Avoyelles Country Club *1284 v. Walter Kidde & Company, supra; AMCO Underwriters of Audubon Insurance Company v. American R & S Corp., 329 So.2d 501 (La.App. 1st Cir. 1976)."
In the present case, the plaintiff sustained his burden of establishing, through testimony, that more probably than not his injury was caused by a defect in the composition of the piling, a protruding limb. Certainly, because the manufacturer was aware that these poles were intended for use as pilings, such an injury to men working with them could have been reasonably anticipated. It was not necessary, therefore, that the plaintiff show Ott was negligent. He did, moreover, establish (1) the piling was defective; (2) it was in normal use at the time of the accident; (3) the piling was unreasonably dangerous in that use; and (4) the defect, the protruding branch, caused his injuries. Neither was it shown by Ott in defense that the plaintiff in any way assumed the risk of his injury or that he was performing his work in a negligent manner when the accident occurred.
We do agree, however, with the plaintiff's assignment of error alleging that Ott was cast personally in the district court judgment rather than in the name of his corporation. A review of the record reveals that the plaintiff's second amending petition, including this defendant in the suit, refers only to "Carl Ott, Jr., Poles and Pilings, Inc., a Mississippi corporation licensed to do and doing business in this state." Ott also testified at trial that he conducts his business as a corporation. Accordingly, this court holds that the district court judgment should be amended in this respect.
This court can find no error in the trial court's determination Kent also breached a duty of care owed to the plaintiff. In discussing standards to be met for establishing negligence, the court said in Williams v. City of Alexandria, 376 So.2d 367 (La.App. 3d Cir. 1979), at 370:
"Negligence is conduct which creates an unreasonable risk of foreseeable harm to others. Negligent conduct becomes a cause in fact of harm to another if it was a substantial factor in bringing about that harm. Negligence is determined by the existence of a risk or hazard and by the violation of a duty to protect certain individuals from such risk. Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970). Where the risk of harm encountered by a plaintiff falls within the scope of protection to which a defendant is under a duty to extend, and where there is a breach of that duty, the defendant then becomes liable for any injury resulting to the plaintiff arising from the particular risk or hazard which exists. Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); Dyson v. Gulf Modular Corporation, 338 So.2d 1385 (La. 1976)."
The defect complained of (a protruding limb) was not a hidden one but one which was discernable upon inspection of the pilings. Kent, as the seller of the defective product, certainly had a duty to inspect and discover such defects and we find that the violation of that duty led to the plaintiff's injury.
We also hold that the trial court did not err in refusing to grant Kent's third party demand against Ott for reimbursement of damages for which it is held liable. In the case of Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La.1974), the court refused to hold a retailer liable for damages sustained by the plaintiff, although the manufacturer of the defective product was so held. However, the court noted at 807: There is no evidence in the record from which we could conclude that Reliable Motors [the retailer] or its employees knew or should have known that this wheel and rim were defective." Spillers, therefore, is distinguishable from the case before us where the defect was an apparent one that could have been discovered upon ordinary inspection, which Kent, as the seller of the product, certainly had a duty to perform. Moreover, employees of the buyer of this product were among those individuals to whom this duty extended since it was foreseeable they could be injured by such a defect in the product.
*1285 This court also holds the district court was correct in its determination that Yarbrough and Albarado were executive officers of SOLOCO and that they also breached a personal duty owed to the plaintiff. Accordingly, we hold the policy by Liberty in effect on "executive officers" of SOLOCO at the time of the accident properly covered the liability of Albarado and Yarbrough.[3]
In Canter v. Koehring Company, 283 So.2d 716 (La.1973), the court articulated the following criteria for imposing liability on individual executive officers at 721:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
"2. This duty is delegated by the principal or employer to the defendant.
"3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
"4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm."
Also, in the case of Hadrick v. Diaz, 302 So.2d 345, 353 (La.App. 1st Cir. 1974), the court articulated numerous factors to be considered in a determination of the status of corporate executives:
"In determining the issue before us, our own courts have considered the following circumstances relevant: (1) Whether the employee's position was created by corporate charter, Thibodeaux, above; (2) Whether the employee was formally elected or designated to his office or position by the Board of Directors, the officers or stockholders, Thibodeaux, above; (3) Did the employee have authority, discretion and managerial responsibility covering the divergent affairs of the corporation, Thibodeaux, above; (4) Did the employee have duties or authority outside his particular department, Thibodeaux, above; (5) Was the employee involved in shaping company policy, Thibodeaux, above; Berry, above; (6) Did the employee possess authority to alter contract terms or conditions or to change specified company procedure, Upham, above; (7) Whether the employee had several department heads under his supervision, Berry, above; (8) Whether the employee had a large number of employees under his direction and control, and (9) Did the employee have authority to hire and fire other employees, Berry, above? In Guillory v. Aetna Insurance Company, 415 F.2d 650 (Fifth Circuit), the court also considered whether the employee maintained a close connection with the corporate officers and board of directors and whether the employee was empowered to write company checks."
*1286 In the present case it was established through the testimony that Albarado was in charge of implementing safety policies among his men and also for showing them proper techniques for performing the various jobs. It was also established he had the authority to hire and fire, had a close connection with those higher in the corporate structure, and it is inferred he helped shape corporate policy due to input from him at safety meetings. Yarbrough, as Albarado's immediate supervisor and a frequent inspector of the work site, also being higher up on the corporate scale than Albarado, must certainly be considered an "executive officer." Moreover, each had a personal duty to instruct the plaintiff and the other men on the job in proper, safe work techniques as well as a personal responsibility to inspect for and eradicate any unsafe conditions (such as defective work materials) which were apparent.
For these same reasons, the court was correct in dismissing the action as to Townsend, Pitre, Wiltz, and Mabile to whom no negligence could be attributed through the testimony adduced at trial. K. C. Forest Products was also properly dismissed from the suit because, as noted previously, it was established at trial the defective piling in question could not have come from that company.
Regarding the damages awarded to the plaintiff, this court can find no merit in his argument that he should have been awarded damages for future loss of wages and that the trial court's award for pain and suffering should be increased. Dr. Robert E. Hanchey testified he admitted the patient approximately one month after the accident for pelvic traction, heat and physical therapy, but he did not improve with these treatments with regard to his back, left hip and left leg.
Dr. Hanchey said the patient underwent a myelogram, which showed an extradural herniated disc type defect on the left, and stated the plaintiff subsequently underwent surgery. He added the plaintiff was discharged and he had seen him "seven or eight times subsequent to that and basically this man has continued to complain of pain in his back and left leg."
Dr. Hanchey's opinion was that the plaintiff would not sufficiently improve to perform any type of heavy manual labor. He also said it was his impression that the herniated disc was not acute but had been herniated for a lengthy period of time prior to the injury; however, it was also his impression the injury aggravated this pre-existing but relatively asymptomatic degenerated disc. He did not think the plaintiff would benefit from any further neurosurgical evaluation and treatment, and he felt the most reasonable thing to do would be to refill his non-narcotic analgesics. At the time of Dr. Hanchey's deposition in September, 1978, he had not seen the plaintiff since May of 1977.
It was Dr. Hanchey's opinion the plaintiff could have performed some light duty that would not require any heavy lifting over approximately 20 pounds, if he were so motivated. He also said the plaintiff was extremely obese, weighing around 300 pounds, and that a significant weight loss would increase Joseph's ability to perform manual labor.
In his reasons for judgment, the district court judge made the following statements regarding the court's award of damages:
"Dr. Hanchey found plaintiff to be extremely obese and recommended plaintiff lose at least 100 pounds in weight. He was certain that weight loss would improve plaintiff's back condition. However, although there was no medical reason why plaintiff could not lose weight he had not done so up to the date of trial.
"On several occasions Dr. Hanchey advised and recommended that plaintiff return to work, however, as of the date of trial plaintiff had not attempted to return to work.
"Dr. Hanchey was of the opinion that plaintiff's motivation to improve and to return to work was not good.
"Based on this medical history, this court must find that plaintiff has not proven with reasonable certainty that he *1287 is totally and permanently disabled nor that his future earning capacity has been impaired or lessened:
* * * [T]he medical opinion only bars plaintiff from heavy manual labor. It suggests and recommends that plaintiff can with minimum pain and suffering engage in less strenuous jobs.
* * * [P]laintiff, at the time of the accident, was earning $2.80 per hour. This is minimum wage and this court cannot, as a practical and logical conclusion, find that any less strenuous job would pay plaintiff a wage below this minimum wage standard. Further, the limited abilities of plaintiff appear well suited for a variety of less strenuous jobs.
* * * [P]laintiff has made no effort to seek a less strenuous job.
* * * [P]laintiff has not consulted a doctor nor sought medical attention since May, 1977. His subjective complaints of pain and suffering and inability to perform any manual labor becomes a matter of speculation and conjecture.
* * * [T]he failure of plaintiff to lose weight and the failure of plaintiff to seek employment suggests strongly that plaintiff is not motivated to seek further employment.
* * * When plaintiff was discharged from medical treatment in May, 1977, from the medical opinions we must believe that he was capable of working at less strenuous jobs. Plaintiff is entitled to wages lost during the period of September 11, 1976 to May, 1977, a total of 35 weeks at $2.80 per hour for a 40 hour work week for a total of $3920.00 lost wages.
* * * Plaintiff was subjected to pelvic traction, a lumbar laminectomy, two myelograms. Dr. Hanchey was satisfied that plaintiff's condition caused considerable pain and would cause pain in the future. Regardless of the plaintiff's obesity a tort-feasor takes a victim as he finds him and adequate compensation for plaintiff's pain and suffering, past, present and future will be $50000.00.
* * * The intervening compensation carrier is entitled to reimbursement of compensation paid and medical expenses paid."
This court can find no merit in the plaintiff's argument that based on Dr. Hanchey's opinion he should be awarded damages for loss of future wages. He also urges the court was in error in citing the minimum wage at $2.80 per hour. A review of the Fair Labor Standards, U.S.C.A. 29, § 206(a)(1) reveals that, although the minimum wage may have been less than $2.80 an hour at the time of the accident, at the date of judgment the minimum wage was $3.10 per hour, a considerably higher hourly rate than had been earned by the plaintiff prior to his accident. Because of this, and because of the testimony of Dr. Hanchey establishing the plaintiff could perform some type of work, although not heavy manual work, the trial court judge was correct in his denial of an award for future wage losses.
Neither can this court find the district court abused its much discretion afforded it in the area of damages by awarding the plaintiff $50,000 for pain and suffering. Because of this determination it is not necessary for this court to look to other court awards for comparable injuries, as suggested by plaintiff. Reck v. Stevens, 373 So.2d 498 (La.1979).
For the reasons assigned, the district court judgment is amended inserting the name "Carl Ott, Jr., Poles and Pilings, Inc.," in all places where the name "Carl Ott, Jr." appears. In all other respects, the judgment is affirmed, each party to bear his own cost on appeal.
AMENDED AND AFFIRMED.
NOTES
[1] As defendant in the original demand, third party plaintiff in the incidental demand and defendant in intervention.
[2] Separately as defendant in the main demand and as intervenor.
[3] Although Yarbrough was deceased at the time of trial, the plaintiff had also filed a direct action suit against Liberty as his insurer.