303 So.2d 306 (1974)
Gordon B. NETTLES et ux.
v.
Cecil W. EVANS et al.
No. 9529.
Court of Appeal of Louisiana, First Circuit.
February 11, 1974.
*307 Paul H. Due, Denham Springs, for Mr. and Mrs. Nettles, in 9529.
Dennis R. Whalen and Guy A. Modica, Baton Rouge, for Michael A. Larussa, Ind., etc., in 9530.
W. S. McKenzie, Baton Rouge, for Aetna & Cecil Evans.
Charles W. Franklin, Baton Rouge, for Fireman's Fund.
Alton T. Moran, Baton Rouge, for Evans, Gibbens Assoc., Inc.
Before LANDRY, ELLIS and PICKETT, JJ.
PICKETT, Judge.
This lawsuit arises out of an incident occurring on the night of December 3, 1969, in a Baton Rouge shopping center parking lot. Mrs. Janice J. Nettles was attacked by the defendant, Cecil W. Evans, who struck her on the head and, after she had broken free and started to flee, fired a pistol in her direction. At that time, the defendant, The Aetna Casualty and Surety Company ("Aetna") was the insurer of Evans under a homeowner's liability insurance policy.
Other parties were originally made defendants on the basis of allegations that Evans was their employee or agent and was acting within the course and scope of his employment at the time. The judgments dismissing the suit against these parties have not been appealed.
The trial judge rendered judgment in favor of Mrs. Nettles in the sum of $2,000.00 for her injuries, and in favor of her husband, Gordon B. Nettles in the sum of $123.25 for special damages he incurred as head and master of the community. The judgment cast only the defendant, Evans, because the trial judge found the attack to have been intentional, and thus found Aetna's exclusionary clause with respect to injuries caused "intentionally by" the insured was applicable.
The plaintiffs have appealed from the judgment dismissing the suit as to Aetna, and, also, assert errors with respect to damages. Evans and Aetna have answered the appeal seeking a reversal on the finding of Evans' liability, and alternatively a reduction in the amount of damages. Counsel representing Aetna point out that they represent Evans only insofar as they attempt to show his freedom from liability. But that they represent Aetna exclusively on the issue of policy coverage, which position is adverse to that of Evans.
The dispute as to the nature of the tort liability centers on the evidence that Evans had ingested both diet pills, "preluden", and some quantity of alcohol on the day of the incident. The question is whether the drugs or alcohol, or both, affected Mr. Evans' capability to form an intent to attack Mrs. Nettles, and, if so, whether Mr. Evans knew, or should have known, because of his many years of experience in law enforcement, of the adverse effect of the combination. It was established at the trial, through the expert testimony of Mr. Ray Herd, former supervisor of the State Police crime laboratory, that a combination of certain drugs and alcohol will produce enhanced side effects, greater than the effects of either taken separately. The phenomenon is termed synergism. Herd's testimony with respect to "Preluden" was as follows:
"The drug is prescribed for the same reasons that Amphetamine is. It's a diet drug, but it is also a powerful stimulating *308 drug. And it is, when taken in normal doses a normal person can tolerate the drug without too much side effects. But if it's taken in abnormal doses or with alcohol, then it does produce various degrees of intoxication, hallucinations, confusion."
When asked in this connection to assume that a blood alcohol test was run on Mr. Evans on the night of the incident, which showed 0.1 of one per cent concentration, Mr. Herd responded:
"I might point out that if we assume that he took the drugs that we had in the lab, that was in his car, those were 75 mg. Preludin, sustained action tablets, the normal dose is 12½ mgs. If he took more than one of those, together with alcohol, or even took one with that much alcohol, it could cause mental confusion."
One of the witnesses testified that Mr. Evans told him the following day that he had taken three of the diet pills. Another witness testified that he had run a blood test on Mr. Evans some three hours after the incident which showed a 0.11 concentration, the level of legally presumptive intoxication, and that the rate of decrease in concentration was approximately 0.018 per hour.
Mr. Evans did not appear at the trial, since he had moved to Colorado, but his deposition was introduced. With respect to the incident, he testified as follows:
"Q Well, just what is your recollection? Were you aware that you were committing this act upon her? Do you have any recollection of it? Do you have any awareness?
A I have recollection and awareness of some of the circumstances and events that happened on this, but to say that I was completely aware of it, all of them, no, I was not.
Q Well, I believe you told me that you had taken some diet pills shortly before the incident and had a drink or two afterwards, and you just went out of your head. Is that essentially what happened?
A Yes, sir. That's correct.
Q I believe you told me when we talked a while ago you felt like it was the quiet in the eye of a hurricane or like a silent movie; that was the way you felt?
A Right
Q You were in a daze. Had you taken those diet pills before this day?
A Yes, I had been taking them maybe a week.
Q I take it prior to this incident you hadn't mixed any whiskey with them?
A Not to my knowledge. If I had, it wasn't any amount or didn't affect me.
Q You remember shooting your pistol in the air, and I think you told me it looked like an unusual flame when you shot your pistol into the air in the parking lot?
A I can remember the fire spurting out from the end of it, and I can remember strange things like, gosh, I wonder if I got the right ammunition in this thing people around mebut everybody seemed real quiet, and I really unconcernedI remember people screaming. I remember being thrown into a police car, but it didn't seem like any of it was happening to me. It seemed like it had to be someone else. It was sort of like a situation that I had been through before many times in law enforcement. It felt like I should have been on the other side and that it wasn't happening to me."
As further evidence of the bizarre or unusual nature of the incident, there is testimony that Mr. Evans did not know Mrs. *309 Nettles; and that a witness who had known Mr. Evans for years, had never known him to do anything like this before. This is urged by plaintiffs to indicate that Mr. Evans was not in control of himself and did not "intend" the attack, within the meaning of the exclusionary clause of the insurance policy.
On the other hand, Mrs. Nettles testified that she had no difficulty understanding what Mr. Evans was saying to her during the struggle. He apparently was able to seize her, strike her over the head with his pistol and fire in her direction as she fled. Shortly after his arrest, which was also effected without difficulty, a close friend, Mr. Ben Gibbens, stated that Evans was able to talk to him and walk about, although his speech was somewhat slurred, indicating intoxication. The policeman who administered the test for intoxication stated that Evans was quiet and cooperative, not belligerent.
As noted above, the trial court found, in its reasons for judgment, that Mr. Evans' actions were intentional; that "he very definitely intended the unwarranted contact with deliberate blows to plaintiff's person. During the entire encounter there is nothing which the Court might consider as unintentional on defendant's part."
We do not believe that we can rely on this apparent finding of fact, however, because the trial court, also, found that the defendant's conduct was induced by the influence of the drugs and alcohol as described by the expert testimony of Mr. Herd. The trial court reached its ultimate conclusion by relying on the criminal law rule that voluntary intoxication does not constitute a defense to a crime requiring general intent, such as aggravated battery. See LSA-R.S. 14:15.
In our opinion, the criminal statute does not and cannot establish that an intent exists in fact in an intoxicated person. It merely precludes the assertion that intent was lacking, due to intoxication, as a defense.
In the instant civil proceeding, we must be concerned with whether an intent existed in fact, in order to determine the applicability vel non of the insurer's exclusionary clause. In sum, we have on the one hand the objective appraisal by witnesses that Mr. Evans was not so affected as to destroy or impair his conscious control of his actions. And on the other hand, we have Mr. Evans' description of a hallucination at the time of the incident, which, although self-serving, is consistent with the expert's opinion as to what reactions could be expected under the circumstances.
In this posture, plaintiffs urge that Aetna has not carried its burden of proving the applicability of its exclusionary clause by a preponderance of the evidence. Bezue v. Hartford Accident and Indemnity Co., La.App., 224 So.2d 76.
We agree that the evidence as shown above is inconclusive as to the ultimate determination of Mr. Evans' capacity to intend his acts. We must, therefore, conclude that Aetna has not carried its burden of proof and must be held liable in solido for the injuries caused by the negligent or reckless conduct of Mr. Evans in having placed himself in a condition which he knew or should have known would generally expose others to a risk or harm.
Plaintiff further complains that the Trial Judge erred in refusing to permit plaintiff to offer evidence to substantiate Mrs. Nettles' claim for damages for embarrassment and humiliation. The only question directed at that point caused the following colloquy:
"Q. Was she, and were you, subjected to any insinuations...

*310 Mr. McKenzie: Your Honor, I object to this because...
The Court: Objection sustained.
Mr. Due: No further questions."
Plaintiff made no further attempt to bring up the subject, to rephrase his question or make a proffer of the evidence. It is apparent that he abandoned that line of questioning, and cannot now complain.
With respect to the amount of damages, the trial court found that Mrs. Nettles had sustained two lacerations of the scalp, requiring twelve sutures. Her treating physician, Dr. Herschel B. Dean, saw her only three times, including the date of the incident, those times being December 3, 5 and 10, 1969, when she was discharged. The trial court, also emphasized the severe emotional distress sustained by Mrs. Nettles and based the award of $2,000.00 primarily on this element. We cannot say this award is either excessive or inadequate. With respect to the award of special damages to Mr. Nettles, it has been pointed out that the trial court inadvertently omitted the $40.00 bill of Dr. Dean. The judgment will be amended to include this item.
For the above and foregoing reasons, the judgment of the trial court is reversed insofar as it dismissed plaintiff's suit against the Aetna Casualty and Surety Company; and judgment is hereby rendered against said defendant in solido with Cecil W. Evans in favor of Mrs. Janice J. Nettles in the sum of $2,000.00, and in favor of Gordon B. Nettles in the sum of $163.25, representing an amendment increasing the trial court's award by $40.00 for omitted medical expenses, together with legal interest and costs. The costs of this appeal are assessed against defendant-appellee, the Aetna Casualty and Surety Company.
Amended and affirmed in part, reversed in part, and rendered.