**AMERICAN FAMILY MUTUAL INSURANCE COMPANY,**
Petitioner, Appellant,

v.

Stephen O'Dean PETERSON, Lana L. Kelsey, Respondents.

No. C8–85–1187.

Court of Appeals of Minnesota.

Sept. 16, 1986.

Review Granted Nov. 19, 1986.

Frederic N. Brown, Daniel F. Ruffalo, Rochester, for appellant.

Jeffrey A. Hanson, Peggy Sue Juergens, Dunlap, Keith, Finseth, Berndt & Sandberg, P.A., Rochester, for Stephen O'Dean Peterson.

Steven S. Fuller, O'Brien, Ehrick, Wolf, Deaner & Downing, Rochester, for Lana Kelsey.

Considered and decided by LESLIE, P.J., and WOZNIAK and CRIPPEN, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

Respondent Lana Kelsey was injured on August 29, 1981, by respondent Stephen Peterson when Peterson struck her on the head with a hammer. She commenced a lawsuit against Peterson, which he tendered for defense to his homeowner's insurance company, appellant American Family. American Family initiated a declaratory judgment action to determine whether

Peterson's actions came within the intentional injury exclusion clause of his liability policy.

The case was tried before a jury, which returned a special verdict finding Peterson did not intend to cause harm to Kelsey. American Family appeals from the judgments entered by the trial court. We reverse and remand for a new trial.

## FACTS

At approximately 4:30 p.m. on August 28, 1981, respondent Lana Kelsey arrived at her home in Rochester. She was about to enter when she noticed a car drive up the street and stop in front of her home. She recognized the driver of the car as respondent Stephen Peterson, the boyfriend of her upstairs tenant, Denise Hanson. Hanson was not at home. Kelsey testified that Peterson came to her door and asked for the key to Hanson's apartment. He explained to her that he wanted to get into Hanson's apartment to start packing her belongings. Hanson was not home at the time. She was in the process of moving in with Peterson at his Minneapolis home.

Kelsey initially refused his request, but then suggested that if Peterson would give his car keys to her, she would let him have the apartment key. After exchanging keys, Peterson started up the outside staircase to Hanson's apartment. He then turned and requested Kelsey to come upstairs. He said that Hanson wanted him to show her something in the apartment. She followed him up the stairs and into the apartment. Upon entering the kitchen, Peterson, referring to the stove and refrigerator, asked her "what do you want for these?" Kelsey said that she was not interested in selling these appliances to him.

She testified that Peterson did not say anything after being told that the appliances were not for sale. Peterson was standing in front of the stove facing towards it while she was standing just inside the doorway. He then turned around and walked by her. She started to follow behind him out of the kitchen when he abruptly stopped in the doorway, causing Kelsey to almost bump into him. It was at this time that she first noticed the smell of alcohol. Prior to this time, she had not noticed anything about his conduct or appearance that would indicate that he was under the influence of alcohol. Kelsey then took a step or two back from Peterson expecting him to turn and go out the door.

Instead of leaving, Peterson walked past Kelsey, who was standing in the middle of the kitchen, and went over to a cardboard box that was next to the stove. He reached into the box, took out a hammer, raised it to his shoulder, walked over to Kelsey, and struck her on the head with it. The blow caused her to sink to her knees. Kelsey, not knowing what to do, threw a tablecloth at Peterson. Peterson reacted in anger. Still holding the hammer as if to strike her again, he clenched his teeth and told her that "I could kill you." He repeated this statement to her a number of times.

Kelsey testified that she "scooted" across the kitchen floor until she was against the dishwasher. Peterson came at her again with the hammer still raised as if to strike her, but then stopped. Kelsey could not recall exactly how many times he came at her with the hammer raised. Each time he approached her, he would stop, back away, and then come at her again. The blood spurting from the wound in her head seemed to deter him.

Peterson then ordered her to lie down flat on the kitchen floor. He repeated this demand a number of times. Kelsey, who thought he was going to rape her, lost control of her bladder. Her reaction, she said, startled the both of them. She also testified that she thought she was going to be killed.

At some point after this initial attack, Peterson realized he did not have the keys to his car and told Kelsey to give them to him. In the process of handing him the keys, her hand touched his. He recoiled from this contact and he told her not to touch him again.

Near the end of Peterson's attack, Kelsey asked him why he was doing this to her. In response, Peterson moved toward her, but instead of striking her, he reached into the sink and gave her a dish rag for her wound. He then asked her how to reach an ambulance, whereupon he went to the hallway, returned with the telephone, and dialed 911. Peterson requested that the operator send an ambulance to the address that Kelsey gave him. She testified that, during this brief conversation with the operator, Peterson was calm and composed. After calling the ambulance, Peterson gave Kelsey the telephone receiver and she slumped to the floor with it. He then moved over the top of her with one leg on each side and, according to Kelsey's testimony, threw a "temper tantrum" by smashing everything on the kitchen counter with the hammer. Peterson finally ran out of the apartment with the hammer still in his hand, got into his car, and drove away. Rochester police arrested Peterson at approximately 9:45 p.m. that same evening and charged him with assault. He subsequently pleaded guilty to assault in the second degree.

At trial, Harvey Vara, a co-worker of Peterson's, testified that he had been drinking with Peterson the morning of the assault. He testified that they started drinking at a New Hope bar shortly after they left work at approximately 8:30 a.m. He drank with Peterson until about 10:00 a.m. and then left. Peterson remained at the bar. Vara did not know how much alcohol he or Peterson had consumed that morning. He did not know if Peterson was drunk when he left at 10:00 a.m. Peterson's own recollection of the morning was quite sketchy. He remembered being in the bar, then going to his Minneapolis home, but from that point on he could not remember the events in question. He stated that his recollection of the remainder of that day was a composite of his memory and the statements of Mrs. Kelsey. He does not recall the drive from Minneapolis to Rochester. The only other testimony from Peterson and his expert, Tom Minokanich, was about his drinking habits at this time.

Minokanich testified that Peterson was an alcoholic and that Peterson was intoxicated at the time of the attack upon Mrs. Kelsey. Minokanich stated that he was relying upon Peterson's recollections of the events of that day in arriving at this conclusion. He testified that he did not believe that Peterson had any intention of hurting Kelsey, and that it was more of a reaction.

The jury found that Peterson did not intend to cause injury to Kelsey when he struck her with the hammer, and that Peterson did not intend injury to Kelsey during the events which occurred after he struck her with the hammer.

## ISSUES

1. Did the trial court err in failing to instruct the jury regarding the effect of the insured's intoxication on his mental capacity to form an intent or to understand the probable results of his acts?

2. Did the trial court err in failing to provide a special verdict question regarding the insured's mental capacity to form an intent?

## ANALYSIS

1. Peterson's homeowner's policy contained an exclusion for "bodily injury or property damage * * * which is expected or intended by an insured." American Family contends the trial court should have held that Peterson's acts were intentional as a matter of law.

An injury is "expected or intended" "if a reason for the insured's act is to inflict bodily injury or 'when the character of the act is such that an intention to inflict an injury can be inferred' as a matter of law." *Continental Western Insurance Co. v. Toal*, 309 Minn. 169, 177, 244 N.W.2d 121, 125 (1976).

The "intent" required to exclude coverage is neither the "intent *to act*" nor the "intent to cause the *specific* injury complained of." Rather, it is the "intent to *cause bodily injury*" even if the actual injury is more severe or of a different nature than the injury intended.

*Iowa Kemper Insurance Co. v. Stone,* 269 N.W.2d 885, 887 (Minn.1978) (emphasis in original; footnote omitted).

But for the issue of intoxication, Peterson's conduct was such that intent to injure should be inferred as a matter of law. Peterson's battery was clearly not "reflexive," *Brown v. State Automobile & Casualty Underwriters,* 293 N.W.2d 822, 824 (Minn.1980), or done in self-defense, *Farmers Insurance Exchange v. Sipple,* 255 N.W.2d 373, 376–77 (Minn.1977). The only question is therefore the effect of intoxication on Peterson's intent. There are no Minnesota cases which deal with this issue.

In other jurisdictions, the mental state of the insured is a litigable issue in determining whether an act was intentional under an intentional act exclusion. *See, e.g., Congregation of Rodef Sholom v. American Motorists Insurance Co.,* 91 Cal.App.3d 690, 154 Cal.Rptr. 348 (1979) (trial court erred in failing to give instruction that act was not intentional if committed while insured was suffering from a mental defect which deprived him of capacity to conform his conduct in accordance with reason); *Ruvolo v. American Casualty Co.,* 39 N.J. 490, 189 A.2d 204 (1963) (where insured shot victim while suffering from derangement of intellect which deprived him of capacity to govern his conduct in accordance with reason and while in that condition acted on irrational impulse, killing was not intentional within meaning of policy).

Courts which have considered the issue have held that intoxication must be considered by the factfinder in determining whether the insured had the capacity to form the requisite intent or to realize the probable results of his actions. *See Badger Mutual Insurance Co. v. Murry,* 54 Ill.App.3d 459, 12 Ill.Dec. 672, 370 N.E.2d 295 (1977) (record supported finding that insured was not so intoxicated as to be unable to realize the probable results of his actions); *Nettles v. Evans,* 303 So.2d 306 (La.Ct.App.1974) (trial court erred in finding insured's act was intentional where trial court also found insured's conduct was induced by the influence of drugs and alco-

hol); *Lyons v. Hartford Insurance Group,* 125 N.J.Super. 239, 310 A.2d 485 (1973); *Nationwide Mutual Insurance Co. v. Hassinger,* 325 Pa.Super. 484, 473 A.2d 171 (1984) (trial court properly instructed jury that intoxicants imbibed by motorist were to be considered in determining if motorist had ability to form an intent).

■ We find the rule expressed in these cases persuasive. We believe that intoxication may under appropriate circumstances be considered in determining whether an insured acted intentionally. We believe this position is consistent with the underlying purpose of intentional act exclusions, which is to prevent extending to an insured a license to commit malicious acts. *See Woida v. North Star Mutual Insurance Co.,* 306 N.W.2d 570, 573 (Minn.1981). An individual who is so intoxicated as to be unable to conform his conduct to the law will not be deterred by the nonexistence of insurance coverage for his acts. *See Congregation of Rodef Sholom,* 91 Cal.App.3d at 697, 154 Cal.Rptr. at 352.

Considerable expert testimony was introduced at trial concerning the effects of intoxication, blackouts, and extended heavy drinking. Evidence was introduced that Peterson had in fact engaged in extended heavy drinking on the morning of the assault and battery. It is reasonable to conclude that the jury considered this evidence in finding that Peterson did not act intentionally. We remand for a new trial, however, on the ground that the jury was not properly instructed on the extent to which they could consider intoxication.

The jury was given the following instruction on intent to injure:

The question for you to decide is whether what the Defendant Peterson did was done with an intent to cause an injury. Not necessarily the injuries which resulted, but to cause some injury. As used in the insurance policy, expect and intend have the same meaning.

■ The trial court has a duty to instruct the jury on all law applicable to the case. *Latourelle v. Horan,* 212 Minn. 520,

524, 4 N.W.2d 343, 345 (1942). The standard for review of jury instructions is:

> Jury instructions must be construed as a whole and tested from the standpoint of total impact on the jury. Errors are fundamental or controlling if they "destroy the substantial correctness of the charge as a whole," cause a miscarriage of justice or result in substantial prejudice. The granting of a motion for a new trial on the ground of erroneous instructions to the jury rests largely in the sound discretion of the court, and its decision will not be disturbed on appeal unless there has been a clear abuse of that discretion.

*Smits v. E-Z Por Corp.*, 365 N.W.2d 352, 354 (Minn.Ct.App.1985) (citations omitted).

■ Our concern is that, under the instruction given, the jury may have placed undue emphasis on Peterson's intoxication in reaching the verdict they did. On remand, the trial court should instruct the jury that voluntary intoxication will deprive an act of its otherwise intentional character only if the insured was so intoxicated that he lacked the capacity to form the requisite intent or was unable to realize the natural and probable results of his actions.

2. Two special verdict questions were given to the jury:

QUESTION 1: Did defendant Stephen Peterson intend to cause injury to Lana Kelsey when he struck her with the hammer?

QUESTION 2: Did defendant Stephen Peterson intend to cause injury to Lana Kelsey during the events which occurred after he struck her with the hammer?

American Family requested that the following special verdict be given:

Question No. 1:

Did Stephen O'Dean Peterson, on August 28, 1981 lack the mental capacity to form an intent to cause injury during the episode where he hit Lana Kelsey with the hammer to the point in time where he left the house?

■ The trial court's failure to provide a special verdict question regarding Peterson's mental capacity was erroneous. The question proposed by American Family would have been sufficient. The questions actually given to the jury did not focus on the real issue in the case—whether Peterson lacked the capacity to form the intent to injure Kelsey. If there had been no intoxication, the court would have been required, as a matter of law, to find the intent to injure. Thus, the special verdict should have gone only to the exact issue before the jury—Peterson's capacity to form an intent.

■ The second special verdict question given by the court was also erroneous. The trial court divided Peterson's acts into two parts: the battery with the hammer and the subsequent assault. The Minnesota Supreme Court has recently held, however, that the issue of whether a victim sustained "bodily injury," within the meaning of an exclusionary clause, must be litigated in the declaratory judgment action along with the issue of intent. *Clemens v. Wilcox*, 392 N.W.2d 863 (Minn.1986). In *Clemens*, the record was incomplete as to whether the victim sustained any "bodily injury." The supreme court therefore remanded for a factual determination on this issue. Here, we have a well-developed record which is devoid of any allegation that Kelsey sustained bodily injury during the events following the hammer blow. Therefore, on remand the issue of whether Peterson's acts following the hammer blow were intentional is not at issue and should not be litigated in the declaratory judgment action. At the main trial on the merits, of course, Kelsey will not necessarily be precluded from establishing damages for mental distress and the like arising out of the assault. *See* W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on the Law of Torts* § 10, at 43 (5th ed. 1984).

American Family argues that the evidence was insufficient to sustain the jury's verdict; the trial court erred in not granting its motion for judgment N.O.V. and other evidentiary rulings. Because we re-

mand for a new trial, we need not address the issue of the sufficiency of the evidence, and the evidentiary rulings must be reconsidered under circumstances as will be developed in the course of a retrial pursuant to the holding of this case.

American Family further argues that the trial court erred in awarding Peterson the attorney's fees incurred in defending this declaratory judgment action. Again, because we are remanding this case for a new trial, we stay any award of fees pending the result of the new trial.

DECISION

Reversed and remanded for a new trial.